THE EASTON NATIONAL BANK

*v.*

THE AMERICAN BRICK AND TILE COMPANY et al.

On appeals of Henry A. Potter, Elisha P. Wilbur and Edward M. Paxson.

[Argued December 1st, 1905.    Decided June 18th, 1906.]

1. Where a corporation organized under the General Corporation act of 1875 and its supplements and amendments (*Rev. 1877 p. 175; 1 Gen. Stat. p. 907*), issued stock certificates that were stamped "issued for property purchased" as if in compliance with section 55 of that act, and it appeared that the stock in question was not in fact issued for property purchased in accordance with the true intent and meaning of the act—*Held*, that the receiver of the company might maintain a proceeding against the recipients of the stock to require them to contribute for the benefit of creditors such proportion of the amount unpaid upon the shares as was required to satisfy the debts of the company, without first filing an independent bill in equity to set aside the supposed contract between the stockholders and the company evidenced by the words "issued for property purchased."

2. Upon a review of the evidence in this case—*Held*, that the stock in question was not "issued for property purchased" within the fair intendment of the act, and that the recipients thereof remain liable to creditors notwithstanding those words were stamped upon the stock certificates.

On appeals from a decree of the chancellor, advised by Vice-Chancellor Bergen, whose opinion is reported *69 N. J. Eq. 326.*

*Messrs. Guild & Marlin,* for the appellant Henry A. Potter.

*Mr. Richard V. Lindabury* and *Mr. Samuel Dickson* (of the Pennsylvania bar), for the appellants Elisha P. Wilbur and Edward M. Paxson's executor.

*Mr. George M. Shipman* and *Mr. W. S. Kirkpatrick* (of the Pennsylvania bar), for the respondents, the Easton National Bank and Clarence Walters, receiver of the American Brick and Tile Company.

The opinion of the court was delivered by

PITNEY, J.

The main cause is a proceeding for the winding up of the American Brick and Tile Company as an insolvent corporation. A receiver having been appointed, and sundry claims being presented to him by creditors of the company, and there being no assets other than the obligations of the subscribers to the capital stock for unpaid subscriptions, the receiver filed a petition praying that an order should be made directing assessments against the stockholders to the extent required for the satisfaction of the debts of the company. The result was a decree which upholds the claims of the Easton National Bank for $19,000 and of Henry Short for $2,100 as valid, and entitled to be paid from the moneys to be raised from unpaid subscriptions to the capital stock; adjudges a certain so-called contract, made between the American Brick and Tile Company, of the one part, and Edward M. Paxson, Elisha P. Wilbur, Henry A. Potter and Henry Green (stockholders), of the other part, by which the stock of the company was issued to them as full-paid for property purchased, to be fraudulent and void as to these creditors, and decrees that these stockholders or their personal representatives are liable to pay to the receiver, for the benefit of the

creditors, so much of the unpaid portion of their stock subscriptions as may be required to pay the claims of the creditors, with the expenses of the receivership.

From so much of the decree as is adverse to them, Potter, Wilbur and Paxson appealed to this court. Since the taking of the appeals the appellant Paxson has died, and his appeal is now prosecuted by his executor, the Fidelity Trust Company.

The American Brick and Tile Company is a corporation of this state, organized under the General Corporation act of 1875 and its supplements (*Rev. 1877 p. 175; 1 Gen. Stat. p. 907*), the articles of association being dated March 30th, 1886; recorded in the clerk's office of Warren county on April 6th, and filed in the secretary of state's office on April 13th, in the same year. By these articles the total amount of capital stock was fixed at $1,000,000, divided into shares of the par value of $100 each. The names of the stockholders and the number of shares held by each were given as follows:

| | | |
|---|---|---|
| Lenox Simpson | 3,000 | shares. |
| Morris P. Canfield | 1,000 | " |
| Henry A. Potter | 1,000 | " |
| Henry Green | 3,000 | " |
| Elisha P. Wilbur | 1,000 | " |
| Edward M. Paxson | 1,000 | " |
| Total | 10,000 | shares. |

The object of the company was the manufacture and sale of bricks and tiles. It appears that Messrs. Simpson and Canfield were the owners of a patent for making brick, tile and other fabrics out of slate, and for a process for converting slate into brick and other fabrics, and had applied for patents for certain improvements in kilns. Messrs. Green and Paxson were at the time judges of the supreme court of Pennsylvania. Mr. Wilbur was president of the Lehigh Valley Railroad Company and an officer of the E. P. Wilbur Trust Company, of Bethlehem. Mr. Potter was a resident of New Jersey, engaged in business in Philadelphia, and was a son-in-law of Judge Green.

Judge Green was the chief promoter of the company, Judge

Paxson and Messrs. Wilbur and Potter his principal associates. The corporation was formed in consequence of an agreement in writing, made March 6th, 1886, between Simpson and Canfield, of the one part, and Judge Green, of the other part, reciting the ownership by Simpson and Canfield of the patents and processes just mentioned, and the purpose of the parties to form a corporation in order to put them into practical use, and that "the said Green is willing to undertake to place the stock of said corporation upon such terms as may be agreed upon between him and the purchasers thereof." Thereupon the parties agreed, *first,* that a·corporation should be formed upon the basis of the said patents, and to carry the same into practical effect, with a capital stock of not less than $1,000,000. *Secondly.* That Green, upon paying into the treasury of the company $20,000, and to Simpson and Canfield $5,000, should be entitled to have and take six-tenths of the capital stock, and Simpson and Canfield, upon assigning the patents to the company, should be entitled to the remaining four-tenths; out of the six-tenths of the capital stock to be taken by Green, he was to deliver to Simpson and Canfield $20,000 worth, par value, upon the assignment and transfer to the company of the patents, and Green was also to deliver into the treasury of the company stock to the par value of $55,000, to be held for the purpose of raising working capital for conducting the operations of the company. *Thirdly.* Simpson and Canfield agreed to assign to the company the patents and all improvements thereon, and to deliver to the company $25,000 worth of stock, at par, out of their four-tenths of the stock, to be used and sold as working capital.

After the incorporation of the company the details of the plan embodied in this agreement were to some extent modified. The patents, however, were assigned by Simpson and Canfield to the company, under date of September 27th, 1887, and the first certificates of stock appear to have been issued on the same date. About the same time Simpson and Canfield agreed with Judge Green upon a modification of the former agreement, discharging him from further performance thereof. There seems to have been an understanding between Green, Paxson, Wilbur and Pot-

ter, somewhat indefinite in its terms, but to the general effect that each should contribute to the company $10,000 in money, or so much thereof as might be necessary to build a plant and put the company in working operation, and that so much of the stock of the company as was not set apart for treasury stock, and as did not go to Simpson and Canfield, was to be divided equally between the four others. It appears that they did pay in, during the years 1886, 1887 and 1888, sums aggregating $10,000 each. Upon the issuance of the stock certificates in 1887, Paxson, Wilbur and Potter each received one thousand five hundred shares, being five hundred shares each beyond the amount for which they originally subscribed. The certificates were all stamped "issued for property purchased," saving two certificates for one hundred shares each, which latter went to Paxson and Wilbur as if issued for cash. Up to this time, however, they had paid into the company only $5,000 each. The proofs render it plain that the entire one thousand five hundred shares issued to each of the appellants, and not merely the one thousand shares each for which they at first subscribed, stand upon the footing of an original stock issue.

For the stock holdings of Messrs. Paxson, Wilbur and Potter, not more than $10,000 each was paid by these gentlemen until the year 1891, when they each paid certain small sums by way of assessments (voluntarily, as is claimed), Judge Paxson paying $4,500, Mr. Wilbur $6,000 and Mr. Potter $1,800. Beyond these payments their stock subscriptions are wholly unsatisfied, except to the extent that they may be deemed to be satisfied by the transfer of the patents to the company and the issuance of the stock as for property purchased.

The pertinent sections of the act under which the company was incorporated are the following:

Section 5 (*Rev. 1877 p. 178; 1 Gen. Stat. p. 910*) declares that

"where the whole capital of a corporation shall not have been paid in, and the capital paid shall be insufficient to satisfy the claims of its creditors, each stockholder shall be bound to pay on each share held by him the sum necessary to complete the amount of such share, as fixed by the charter of the company, or such proportion of that sum as shall be required to satisfy the debts of the company."

Section 54 (*Rev. 1877 p. 186; 1 Gen. Stat. p. 917*) declares

"that nothing but money shall be considered as payment of any part of the capital stock of any company organized under this act, except as hereinafter provided for the purchase of property; and no loan of money shall be made to a stockholder or officer therein," &c.

Section 55 reads as follows:

"The directors of any company incorporated under this act may purchase mines, manufactories or other property necessary for their business and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be declared and taken to be full-paid stock, and not liable to any further call, neither shall the holder thereof be liable for any further payments under any of the provisions of this act, and said stock shall have legibly stamped upon the face thereof the words 'issued for property purchased.' In all statements and reports of the company to be published this stock shall not be stated or reported as being issued for cash paid into the company, but shall be reported in this respect according to the fact."

Other sections (7, 33, 53, &c.) contain provisions intended to prevent the withdrawal by stockholders, directly or indirectly, of any part of the capital stock to the detriment of creditors.

A few familiar cases may be cited: *Wetherbee* v. *Baker, 35 N. J. Eq. (8 Stew.) 501; Hebberd* v. *Southwestern Land and Cattle Co., 55 N. J. Eq. (10 Dick.) 18; See* v. *Heppenheimer, 69 N. J. Eq. 36.* These arose prior to the revision of the Corporation act in 1896. *Donald* v. *American Smelting Co., 62 N. J. Eq. (17 Dick.) 729,* arose under *P. L. 1896 p. 277.*

At this point we may conveniently deal with an objection that is raised by the appellants respecting the form of the procedure. As already remarked, the proceeding brought by the receiver against the present appellants was instituted by the filing of a petition setting forth the facts upon which relief was prayed. To this petition the appellants severally interposed answers, and upon the petition and answers the matter came on for hearing before the vice-chancellor. During the hearing it was objected by the appellants that since the certificates of stock with respect to which the receiver sought to hold the stockholders responsible were marked fully paid, and "issued for property purchased,"

the certificates constituted a contract between the company and its stockholders which, even if the stock had not been fully paid, prevented an assessment until the contract had been set aside as in fraud of creditors; that no order for an assessment upon the stockholders could be made in the proceedings as instituted, and that the proper course was for the receiver to file an independent bill of complaint against them seeking to have the contract under which the stock was issued set aside. The learned vice-chancellor acceded to this view, but since all the evidence necessary to settle the questions that would be raised in such a suit had been taken, counsel for all parties agreed that the receiver might amend his petition by making it a bill of complaint. The vice-chancellor granted leave to amend accordingly, and after the filing of his conclusions the receiver amended his petition by turning it into the form of a bill, adding a prayer that the contract under which the stock was issued as fully paid might be declared fraudulent and set aside on that ground. It is now objected by appellants that if this amended petition be treated as an original bill, it is multifarious, as presenting two opposite and contrary claims for relief, one that the stock was legally issued, subject to future assessment, and the other that the stock was fraudulently issued as fully paid and non-assessable, and that the illegal contract should be annulled. The objection of multifariousness having been raised before the vice-chancellor, the appellants insist that they are now entitled to the benefit of it.

In our view, this whole difficulty is imaginary. Assuming the case showed a contract between the company and its stockholders that the stock certificates should be issued as full paid and as for property purchased, and that this contract was in fact of such a character and made under such circumstances that it contravened the prohibition of the Corporation act, it was not merely voidable, but void. It had as little effect for any purpose as the contract that was before this court in *Volney* v. *Nixon, 68 N. J. Eq. 605*, and could not be laid hold of by either party as a ground of action or a ground of defence. No bill or other original proceeding was necessary to procure an adjudica-

tion of its nullity, and the court, on the petition originally filed by the receiver for the purpose of enforcing the liability of the stockholders for the unpaid portion of their subscriptions, upon ascertaining the facts that rendered the so-called contract void, was at liberty to treat it as affording no obstacle to the relief prayed by the receiver.

This brings us to the merits.

In their answers to the receiver's petition, Messrs. Wilbur, Paxson and Potter severally alleged that upon the incorporation of the company these three, together with Judge Green and Canfield, were elected directors, and that the stock subscriptions of the incorporators, except as to one hundred shares each issued to Paxson and Wilbur, were paid by the purchase of property as follows: that the directors, after careful consideration, determined that the Simpson and Canfield patents were worth at least the sum of $802,400, and that the directors authorized the issue of eight thousand and twenty-four shares of the stock to Simpson and Canfield, or their nominees, in exchange for the patent rights and processes, and the payment to the company by or on behalf of Simpson and Canfield of the sum of $20,000 in cash, and that upon the assignment of the patents and payment of this sum in cash to the company, all the shares of stock in question were marked "issued for property purchased."

Upon the hearing an attempt was made to show that in the estimation of individual directors the patents had a prospective value even as high as $1,000,000. No minute or other formal record of any action taken by the directors or by the stockholders with respect to the issuance of the stock was produced, and the proof mainly relied upon to show action by the directors was the testimony of Judge Paxson and Messrs. Wilbur and Potter, Judge Green having died some time before. As might be expected after the lapse of seventeen years since the transactions in question, the memories of the witnesses were quite uncertain and their testimony exceedingly indefinite. Without rehearsing the evidence, we content ourselves with saying that we agree with the conclusion of the learned vice-chancellor that no official action was taken by the board of directors, and that,

with the exception of informal meetings and general conversations with Judge Green, the negotiations with the patentees were confided entirely to the latter, with the exception on the part of the present appellants that in some way he would arrange matters so that, in exchange for the $10,000 each had advanced, or agreed to advance, stock would be issued to them of the par value of $150,000 each. There is no doubt that at the inception of the company the appellants were very sanguine of its ultimate success, and believed that in future the company might develop an earning capacity proportionate to its capitalization of $1,-000,000, but in view of all the circumstances, including the terms of the purchase from Simpson and Canfield, it is impossible to believe that these eminent and highly respectable gentlemen did, upon their responsibility as directors, resolve that the patents were presently worth in money $800,000 or $1,-000,000, or anything approaching those sums. They were aware of the terms of the agreement of March 12th, 1886, by which Simpson and Canfield, the absolute owners of the patents, agreed to part with them to the company in exchange for $5,000 in cash and a minority interest in the company, whose entire assets would consist of the patents themselves and $20,000 in money.

We also agree with the view of the vice-chancellor that if we were to accept the claim of the appellants that the directors did determine to issue all the stock in question for the patents, it would result that the proceeding must be considered a mere device on the part of the directors to evade the letter and spirit of the Corporation act, to accomplish which the patents were intentionally overvalued. In this view the credit to be given to the stockholders by reason of the transfer of the patents to the company must at least be limited in the present proceeding to the fair value of the patents. Whether for this purpose we should accept the value of these as subsequently demonstrated (which is practically *nil*), or rather such value as might reasonably have been assigned to them at the time, need not be determined, for a reason that will presently appear. The appellants have not presented their proofs in such manner as to enable the court to determine, with any accuracy, the fair value of the

patents at the time they were transferred to the company.  Assuming, however, that they were worth $50,000 at the outside (the proofs will not support so high an estimate), the amount left unpaid (after due credit for cash payments also) upon the stock issued to each of the appellants would far exceed the entire amount of the debts of the company.

Counsel have not referred us to any evidence showing how or when the directors authorized the stock certificates to be stamped "issued for property purchased."  Nor have we, in our examination of the record, discovered any such evidence.  We are inclined to think that it was done, just as many other things respecting the organization and business of the company were done, without formal authorization and without any clear understanding of its legal effect.

Nor can Messrs. Green, Paxson, Wilbur and Potter be considered as being in any legitimate sense vendors of the patents to the company at the price of the large block of stock that was issued to them.  They were promoters of the company, Paxson, Wilbur and Potter being in effect assignees under Judge Green of a part of his interest in the Simpson and Canfield contract, having full notice of the entire transaction.  The whole of the evidence, including the terms of the agreement of March 12th, 1886, itself, convinces us that the only stock that was issued for the patents was that which went to Simpson and Canfield, and that the only consideration for the stock issued to the others was the moneys paid in by them to the company.

To the extent involved in the present appeals the decree under review should be affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, GARRETSON, HENDRICKSON, PITNEY, SWAYZE, REED, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL—13.

*For reversal*—None.