ALBERT C. STEPHANY

*v.*

JOHN E. MARSDEN et al.

[Decided December 16th, 1908.]

1. It being contrary to public policy to permit a director of a corporation to freely contract with the corporate body, such contracts are voidable at the option of the corporation.

2. A corporation must exercise its right to avoid a contract with a director within a reasonable time, the length of which is dependent on the circumstances of a given case.

3. Where a corporation elects to avoid a contract with a director, equity will place the parties in *statu quo* by requiring payment of what the corporation has received.

4. A director of a corporation occupies a fiduciary relationship to it in the nature of that of a trustee to a *cestui que trust*.

5. Since the stockholders of a corporation owe no fiduciary relation to it, all of the stockholders by mutual agreement may authorize the corporation to contract with a director, or may ratify such a contract already made which they believe to be beneficial to the corporation.

6. While the duty to sue to cancel stock issued to promoters without adequate consideration is primarily in a corporation, a stockholder may sue for such relief, where the control of the corporation is in such interests that it would be futile to expect that it would prosecute the suit with vigor.

7. A corporation voted certain stock to a promoter in return in part for a mail order system for the sale of the corporation's product. Complainant for several years acted as a stockholder, director, and secretary of the corporation, with knowledge of such transaction, and, while the system was probably worth much less than what the corporation paid for it, complainant made no objection to the contract until after the system became obsolete, and until it was practically impossible to determine its value at the time the contract was made, nor until after the stock increased greatly in value, because other profitable means of disposing of the corporation's product were devised.—*Held*, that complainant was barred by laches from maintaining a suit on behalf of the corporation to have the contract set aside.

*Mr. Joseph H. Gaskill* and *Mr. Ulysses G. Styron,* for the complainant.

*Mr. Norman Grey, Mr. Charles A. Baake* and *William B. Linn,* for the defendants.

LEAMING, V. C. (orally).

The law which controls our courts in dealing with transactions of this nature is so well defined, and the facts of the case are so much fresher in my mind at this time than they will be at some later period, that I doubt the advisability of taking the case under advisement.

The court of errors and appeals of this state has held that it is so far contrary to public policy to permit a director of a corporation to freely contract with the corporate body of which he is a director that contracts so made must be deemed voidable at the option of the corporation. I have observed a tendency of recent years, arising largely from the extensive and complex dealings and relations of modern trading corporations, to relax this rule; the tendency being, as I have observed it, to inaugurate the modi-

fied doctrine that such contracts should not be deemed voidable at the mere option of the corporation, but that the burden should be imposed upon those seeking to enforce or support such a contract to clearly establish its fairness. I think, however, that the general rule, as I have briefly defined it, as established by our court of errors and appeals, cannot be said to have been in any way relaxed by that court since it was there first stated in the case of *Stewart* v. *Lehigh Valley Railroad Co.,* and it has since been by that court so repeatedly approved and recognized that I must regard it as a fixed part of the jurisprudence of this state. The rule, however, is subject to certain well-recognized and well-defined limitations. One limitation may be said to be that the right of a corporation to avoid at its option a contract in which a director of the corporation is a party must be exercised by the corporation within a reasonable time. What is a reasonable time must be dependent in a large measure upon the particular circumstances of any given case; but it is manifest that in any case the longer delay occurs in the exercise of the privilege upon the part of the corporation, the more likely it is that changing conditions will render it impossible for a court of equity to restore, with any degree of accuracy or completeness, the original conditions, and relief, if granted, must always be granted upon equitable terms and with an object to restore the pre-existing conditions as nearly as possible. A director of a corporation may loan money to his corporation and may be unable to recover the money so loaned by the inherent force of the contract by reason of the fact that the corporation will be privileged to avoid the contract as such; but in such a case there still exists upon the part of the corporation an obligation which the law imposes upon it to repay the money which it has received, and that obligation a court of equity must protect in any effort upon the part of the corporation to avoid the contract. So, where property has been conveyed to a corporation by a director of the corporation, while the contract under which the conveyance has been made may be avoided by the corporation, it will be the duty of a court of equity to restore to the party who made the conveyance such property or values as he has parted with and as have passed to the corporation, and any considerable efflux

of time after such a transaction is liable to render it more or less difficult, or, perhaps, impossible for a court to restore original conditions or to adopt substituted conditions with fairness or accuracy. A second limitation which may be said to exist arises from a distinction which must be recognized between the relation of a stockholder to a corporation and the relation of a director to a corporation. A director's duties are trust duties, or, more accurately speaking, are so nearly of the nature of the duties of a trustee to his *cestui que trust* that a fiduciary relationship with its attendant responsibilities is appropriately said to exist between the director and the corporation; whereas, the position of the stockholder of a corporation is not one of trust, for a stockholder owns that which may be said to represent an integral proportionate part of the corporation as a property right, and it is his privilege to protect that right and to deal with it and to deal with his corporation in accordance with his best judgment, so there is no reason why all of the stockholders of a corporation may not, by mutual agreement, co-operate to enable the corporation which they collectively comprise to make a contract with one of its directors, or to ratify such a contract already made, if the stockholders believe that such a course is beneficial. The limitation to which I refer therefore is that the stockholders may either authorize or approve of a contract between a corporation and one of its directors when they believe such a contract to be beneficial.

In the present case, the right of the corporation to avoid the contract now in question is asserted by an individual stockholder of the corporation; complainant asking as a stockholder that three hundred shares (of the par value of $15,000) of the capital stock of the Liberty Cut Glass Company of New Jersey be canceled. This stock was issued by the corporation named to three parties, who have been called its promoters, and now belongs to one of the three, namely, defendant John E. Marsden. Where rights of this nature of a corporation are to be asserted, it is primarily the duty of the corporation to assert such rights; but, where the management of the corporation is in hands whose interests will be injuriously affected by the assertion of the rights claimed, it cannot be reasonably expected that the corporation will be active in the matter, and the privilege is accordingly given

to an individual stockholder to protect his individual stock interests in a suit of the nature of the present one in behalf of the corporation, and I think the evidence in this case sufficiently shows that the management of the Liberty Cut Glass Company of New Jersey is in such hands that it would have been entirely futile for the complainant to have asked that this suit be prosecuted with vigor by the corporation itself, and this suit may therefore be sustained in its fullness by the individual stockholder, the complainant here, Albert C. Stephany.

The question therefore presented is whether a conveyance made by Mr. Marsden, the defendant, and his two associate promoters, to the Liberty Cut Glass Company at the time of its organization, for which conveyance there was received by the three promoters the $15,000, par value, of stock of the corporation, shall be set aside and the stock so issued canceled, either in whole or in part. The ground of the relief sought is that the contract of sale was not only a contract between the corporation and three men who were the promoters and directors, but it is also claimed affirmatively upon the part of complainant that the contract of sale was made under false and fraudulent representations upon the part of defendant Marsden and his two associates, and that values and existing conditions were by them represented to the corporation to exist, which, in fact, did not exist, and that there has been a failure, if not entire. then nearly so, of the consideration for which the stock was issued. I doubt the propriety of going at length into the details of the conditions which existed at the time of the organization of the Liberty Cut Glass Company, and the transfer to it of the property rights which were made the consideration for the stock in question; but perhaps I should briefly summarize the situation at that time by the statement that Mr. Marsden and his two associates were at the time the owners of nearly all the corporate stock of a Delaware corporation operating at Philadelphia, and known as the "Quaker City Cut Glass Company," which corporation was engaged in a business similar to that of the proposed business of the New Jersey corporation then about to be formed. Mr. Marsden and his two associates referred to were also associated as partners in an enterprise which in effect made them sales agents of the Philadelphia corporation.

The enterprise consisted of what they called a "mail order system" of placing cut glass upon the market. That system Mr. Marsden and his two associates claim to have originated and to have actively prosecuted for a period of eighteen months prior to the formation of the New Jersey corporation, and by the testimony of Mr. Marsden it is claimed that a considerable sum of money has been spent in developing the system to its then condition; their expenditures having included a large amount paid for advertising and other incidental expenses. At the time of the proposed formation of the New Jersey corporation in the fall of 1902, the partnership business of the three sales agents referred to, known as the "mail order business," had reached, as Mr. Marsden claims, a considerable magnitude and was prosperous. It was at that time that the plan was originated whereby it was proposed to establish a New Jersey corporation at Egg Harbor under the same name which the three partners had been using up to that time, namely, the Liberty Cut Glass Company, which corporation should take over the name and the trade and whatever tangible business assets there were of the Philadelphia partnership, and should issue to the three partners in payment for such assets the stock now in question. To that end a public meeting was held in Egg Harbor, at which meeting defendant Marsden and his two associates enlightened those present as to the general plan, and at that meeting some stock was subscribed. The idea given out at that meeting appears to have been that Mr. Marsden and his two associates were to supply to the new company, in value at least, dollar for dollar against such money as the Egg Harbor people should put into the concern. To that end subscriptions to stock were taken, with a view of raising $15,000 by local subscriptions, and $15,000 in value was to be supplied by Mr. Marsden and his associates by conveying to the corporation the assets already referred to which they possessed. The corporation was formed, and the three incorporators met on October 3d, 1902, to hold the organization meeting. At that time there were present a number of the stockholders who had or were about to subscribe for shares which were to be paid for in cash. At that meeting a resolution was passed by the three men named in the charter of the corporation, who were holding the organization meeting, au-

thorizing the board of directors to take over these assets from Mr. Marsden and his associates and to issue full-paid stock to them to the amount of three hundred shares, or $15,000. The Egg Harbor people, who were present at that meeting in considerable number, were invited to participate in the proceedings of the meeting, and did so, and I think the minutes show that those who were present unanimously voted for the resolution authorizing the purchase. A preliminary agreement had already been drawn under date of October 3d, 1902, which embodied very fully the general proposition in effect as I have stated it, except that other details to which I have not yet referred were embodied in the written proposition. After the meeting of the incorporators and the election by them of a board of seven directors, of whom Mr. Marsden and his two associates were three, and of whom Egg Harbor subscribers for stock were four, a directors' meeting was at once held, and the contract in question was made with Mr. Marsden and his two associates, pursuant to a resolution of that meeting, which resolution was in accordance with the vote of the preceding organizers' meeting; and pursuant to that authorization the conveyance now in question was made to the corporation of the rights which Mr. Marsden and his two associates had been up to that time exercising and which they owned, and the stock now in question was issued. While I think the bill of sale which was made by Mr. Marsden and his two associates to the company refers only to the mail order business and its assets, the testimony discloses that what was in fact the consideration for the issuance of the stock to Mr. Marsden and his associates was not only the mail order business, but also the engagement of Mr. Marsden and his associates to cause the Philadelphia company, the Quaker City Glass Company, to enter into a five years contract with the new Liberty company, whereby the former company should agree to take of the manufactured products of the new Liberty company $25,000 worth of manufactured products a year for five years at a profit above cost to the new Liberty company of fifteen per cent. So the two elements, the mail order business and the guaranteed contract, were the things which formed the consideration for the issuance of this stock. Whether or not both are expressly named in the bill of sale I am not sure, but both are set forth at length in the written preliminary agreement.

I am strongly impressed, as I view the situation in the light of developments which have transpired since this transaction occurred in 1902, that the values conveyed by Mr. Marsden and his associates to the Liberty Cut Glass Company were less, considerably less, than $15,000 in amount, but the difficulty which necessarily confronts one, after so long a time has elapsed, in ascertaining what the real values were which were conveyed, arises from the fact that it is almost impossible for one to transport himself, in effect, to that early date and accurately view conditions from the more limited viewpoints that one would then have had. This mailing contract business, according to Mr. Marsden's testimony, was then of great value and a source of great profit both present and prospective, but soon thereafter became less valuable by reason of a fact which could not then have been discerned, namely, that others soon inaugurated the pursuit of the same system, and the opposition which thus arose destroyed the profits which before that time had been possible through those channels.

In undertaking to assume a viewpoint of the year 1902 we can only appropriately view such things as could then have been seen, and, if it were not within the reasonable contemplation of the parties at that time that new business conditions of the nature referred to would arise, it is improper at this time to base a judgment upon those new conditions which have since developed and become presently apparent. So it is manifestly difficult to determine, in case this stock should at this time be set aside, what values should equitably be restored to Mr. Marsden in lieu of the cancellation of the contract. Such values as should equitably be restored would be the values which then existed of the assets which Mr. Marsden and his associates placed in the hands of the new company, and they included, as already stated, not only the mail-order business, but also what then appeared to be, and what I may say now appears to have been, a valuable asset in the nature of a guaranteed contract with the Quaker City Glass Company, under which that corporation was to become obligated to purchase, at a fifteen per cent. profit to the new corporation, the amount already stated of the products of the new concern. So I find myself embarrassed, extremely so, in ascer-

taining a satisfactory method whereby I may, with what I can regard as reasonable accuracy, determine upon a basis for compensation to defendant Marsden in the nature of a restoration of rights in value equal to the rights which were delivered to the new company, should the stock be canceled pursuant to the prayer of the bill.

It is manifest that rights cannot be restored as they originally existed, because the business which was conveyed has now disappeared entirely, and the difficulties which thus exist arise primarily from the fact that the present suit was instituted at a time so long after the time when the original transaction occurred, the present bill not having been filed until August, 1907. It is apparent that no corporation has the right to speculate upon its privilege to avoid a contract which it has made. Its right of rescission cannot be held in abeyance awaiting the changing conditions of time to the end that the results of the contract may be retained if found desirable or profitable and rejected if found unsatisfactory. The importance and extreme fairness therefore of the principle that a right of this nature, an option of this nature, should be exercised, if at all, promptly, is manifest in almost every aspect in which we approach this or any case. At the organization meeting to which I have referred, Mr. Stephany was present and participated. His name was proposed as a director, but others received more votes than he, and his name was not among those who were declared elected. He was, however, made a director at the annual meeting which was held January 19th, 1904, and during the time between the organization meeting in October, 1902, and the annual meeting in 1904, Mr. Stephany had remained continuously a stockholder. I am unable to agree with the suggestion made by counsel of the defendant to the effect that the participation of the stockholders in the organization meeting would operate as either a ratification or direction upon the part of the stockholders for the purchase of this property and therefore become the individual act of the stockholders or the act of the corporation by virtue of the unanimous or practically unanimous consent of its stockholders given at that time; but it does appear that a meeting of the stockholders was held January 20th, 1903—the first succeeding annual

meeting—at which meeting there were present four hundred and twenty-nine shares of stock and were absent seventy-six shares of stock, the total stock having been five hundred and five shares. At that meeting a new board of directors was elected. The three hundred shares of stock in question were voted by Mr. Marsden and his associates, but of the four hundred and twenty-nine shares present one hundred and twenty-nine, which was more than a majority of the stock exclusive of the stock in question, was represented and voted for those directors. That meeting, as will be seen, was only a short time, three months, after the organization meeting. The next annual meeting after operations had actively begun was on January 19th, 1904. At that meeting there were four hundred and eleven shares present, which, excluding the three hundred shares now in question, left one hundred and eleven shares of stock, or more than half of the stock held by the Egg Harbor people. At that meeting Mr. Stephany was present and was elected a director, and I believe nominated by Mr. Diamond, one of Mr. Marsden's associates, as a director. At that meeting a report was made by the president of the corporation to its stockholders, and in that report it was shown what the amount of sales had been under the Quaker City contract, and also what the amount of sales had been up to that date under the mail-order system, so that at that time the practical operative results of the two classes of assets which had been turned over to the Liberty company were displayed to the assembled stockholders, and if the results which had been obtained during that period of one year and three months by the use of those assets by the Liberty company indicated a lesser value of these assets than had been represented by the promoters, or indicated a lesser value than the amount which had been paid, then a duty at that time devolved upon the stockholders who were present to exercise any rights they had in the way of avoidance of the obligations of the company which had been given as a consideration for the transfer of the assets.

Stockholders who were not present were privileged to be present and were in a measure chargeable with notice of what occurred. Mr. Stephany is a man of acute intelligence. At that time he well knew what had been paid for the assets which had

been turned over to the corporation, and at that time was informed what the practical results had been in the handling of those assets by the corporation, and as an intelligent man it became his duty and the duty of all stockholders to inquire and ascertain the value of these assets, and to ascertain whether any misrepresentations of value or failure of consideration existed, and to assert such rights as belonged to the corporation, rather than to permit the corporation to continue to utilize the assets for an indefinite period and in effect speculate upon the developments of time. No action, however, was taken looking to the rescission of the contract, and again in January, 1905, there were present at the stockholders' meeting four hundred and forty-seven shares, which, excluding the three hundred shares in question, left one hundred and forty-seven shares, more than a majority of the stock held by the Egg Harbor people, and Mr. Stephany was present and was elected secretary and director. On January 16th, 1906, another stockholders' meeting occurred, at which more than a majority of the stock, excluding the three hundred shares in question, were present and participated, and Mr. Stephany, I think, at that meeting was again re-elected both as a director and secretary. I think it also appeared at that meeting that the profits of the concern had reached ten per cent. net for the then current year. At that time the company was still operating under the Quaker City contract, but, as I recall it, the mail-order business had at that time practically ceased. On May 15th, 1906, the Quaker City contract was canceled. The reason for its cancellation may not be material, but it was canceled by mutual agreement of the Quaker City company and the Liberty company. It does appear, and is undoubtedly a fact, that up to that time the Liberty company had been suffering for want of capital. It had been anticipated at the outset that they would need $15,000 cash capital, and the subscriptions which were forthcoming only reached about $10,000, and there had been, in consequence, a shortage of cash capital, and the Quaker City company had, according to the testimony, gone far in the line of indulgence to the Liberty company. They had supplied to the Liberty company a line of credit which, in some measure, had enabled the Liberty company to conduct its affairs at a profit,

and without that line of credit it appears that the Liberty company would, in all probability, have been embarrassed. At any rate, a friction occurred between the two companies, and that friction seems to have occurred because of a claim upon the part of the Liberty company, or Mr. Marsden representing the Liberty company, that the Liberty company was entitled, under the contract, to a fifteen per cent. profit on the cost of the blanks, which blanks, as I understand it, were articles manufactured by other glass companies in the rough, and which were ground by the Liberty company. Without undertaking to ascertain whether such a claim was valid or not, I am impressed that any charge upon the part of the Liberty company, under the contract referred to, of fifteen per cent. of the cost of blanks, when those blanks had been supplied by the Quaker City company to the Liberty company and had not been paid for, was a severe strain on the spirit of the contract. However, the controversy resulted in a compromise agreement by which the contract was abrogated, and there seems to be no doubt that that occurred as the deliberate act of both companies. Since that time the Liberty company has been proceeding with its work at a profit, and at a considerable profit. They have gone into a new system of handling their products to advantage, as appears by the testimony, so that in the year 1907 they appear to have made, as nearly as I can ascertain, something like thirty per cent. on their capital of $25,000. The concern is manifestly a flourishing concern at this time. They have been enabled to carry to a surplus account enough profits to give them a better working capital, and are now making profits to the amount I have named. If the $15,000 stock held by Mr. Marsden is wiped out, the remaining stockholders, at the present rate of earnings, will be receiving something like eighty per cent. profits in the way of dividends and surplus under the present showing. Each year the annual stockholders' meetings have been held, and I think at each annual meeting Mr. Stephany has been present, and such stockholders who have not been present have been privileged to be and have been privileged to acquire an intimate knowledge of the affairs of the concern. They had the opportunity to know what was being done and what had been done, and it was their duty to embrace that opportunity.

If these circumstances and this long delay in the assertion of corporate rights have not amounted to a ratification of the contract by the stockholders, it seems entirely clear that the long delay in the assertion of the claim now asserted has operated to render it impossible for this court to ascertain at this time with reasonable accuracy or certainty the equitable terms on which relief may now be based, and I am fully convinced that the long delay, under the circumstances named, must be regarded as operative to bar the relief now sought.

It is my judgment, therefore, that the relief which the complainant now seeks must be denied, and I will so advise.