**THOMS v. SUTHERLAND et al.**

**EASTMAN KODAK CO. v. SUTHERLAND, Alien Property Custodian (two cases).**

**Nos. 4512–4514.**

Circuit Court of Appeals, Third Circuit.

Sept. 28, 1931.

See, also, 48 F.(2d) 125, 128.

Shelton Pitney and Waldron M. Ward, both of Newark, N. J., for appellant Thoms.

Lindabury, Depue & Faulks, of Newark, N. J. (John W. Davis, of New York City,

Frederick J. Faulks, of Newark, N. J., and Clarence P. Moser and Herbert R. Reif, both of Rochester, N. Y., of counsel), for appellant Eastman Kodak Co.

Phillip Forman, U. S. Atty., of Trenton, N. J., Ralph E. Lum, of Newark, N. J., Thos. E. Rhodes, of Washington, D. C., and A. Henry Walter and George D. Casto, both of Washington, D. C., for appellee Sutherland.

A. Henry Mosle, Henry A. Stickney, and William O. Gennert, all of New York City, and George W. Grimm, Jr., of Newark, N. J., for appellee Vereinigte Fabriken Photographischer Papiere.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

Two concerns, one domestic and the other foreign, divided between themselves trade territory in North America and Europe for the exclusive sale of certain products and by the same contract provided for the sale of the business of one concern to the other in certain countries. The transaction called for an issue of stock whose validity depends on the validity of the contract. The validity of the contract turns on two principles of law—recognized by all parties—one, that where the purpose of a contract is unreasonably to restrain trade, and other covenants, though valid in themselves, are but incidental to that purpose, the contract is void; the other, that where the purpose of a contract is the sale of a business, and a restrictive covenant as to territory is but ancillary to that legitimate purpose and necessary for the protection of property rights which pass from one to another, the contract is valid. The case, therefore, will be decided according as it may fall within one or the other of these principles. The facts will appear in the summary of the litigation and of the pleadings, which we find necessary to make at some length in order that the case and the grounds for our decision may be understood.

Eastman Kodak Company, a New Jersey corporation was engaged in manufacturing and selling, among other things, Collodion photographic printing-out paper, hereafter called "Collodion papers," mainly, if not entirely, in North America. Vereinigte Fabriken Photographischer Papiere of Dresden, a German corporation, hereafter called the "Dresden Company," together with several companies which it controlled, hereafter called the "associated concerns," was engaged in a similar business mainly in Great Britain and continental Europe. Whether the American and German companies were competitors in this or other lines in these or other countries does not appear. Nor does it appear that together they had a monopoly of the product.

The Dresden Company, for itself and its associated concerns, entered into a contract with the Eastman Company whereby it agreed, among other things, that it would not manufacture, deal in, or sell Collodion papers in North America, Great Britain, France, Spain and Portugal, and the Eastman Company agreed that it would not make and sell the product in any other country of Europe. In consideration for the surrender of the four European countries by the Dresden Company and their acquisition as exclusive trade territory by the Eastman Company, and for other considerations, the latter issued to the former 2,845 shares of its stock of the par value of $100, subsequently converted into 28,450 shares without nominal or par value. The number of shares was based on the Dresden Company's business profits earned on the product in question in those countries for the previous year.

That was in 1903. The Eastman Company paid dividends on this stock to the Dresden Company without any question until, the war being on, the Alien Property Custodian seized the shares under the Trading with the Enemy Act as property of an alien enemy and demanded cancellation of the old certificates and the issuance of new ones in his name. The Eastman Company resisted this demand on the ground, asserted for the first time, that the shares did not exist in law because, as it claimed, they were issued for an illegal consideration. To coerce the delivery of the shares, the Alien Property Custodian brought suit against the Eastman Company in the District Court of the United States for the Western District of New York, which court, later sustained by the Circuit Court of Appeals for the Second Circuit, ordered the cancellation of the certificates of the enemy owner and the issuance of new certificates to the Alien Property Custodian. In re Sutherland (D. C.) 21 F.(2d) 667; Id. (C. C. A.) 23 F.(2d) 595. The Eastman Company, complying with this decree, issued new certificates to the Alien Property Custodian and paid him dividends on the stock until October 1925, but since then has paid him nothing. The Alien Property Custodian then brought this suit at law in the District Court of the United States for the District of New Jersey to recover $853,500 of back dividends

declared between July, 1925 and April, 1929 on the shares captured from the German owner. The Eastman Company filed an answer in the form of an equitable defense alleging that the shares were void ab initio in that they were issued for a consideration which, because involving restraint of trade, was illegal under federal law and were not issued for property as required by the state law of New Jersey, and asking that they be declared null and void and be decreed to be cancelled on its books and records, without offering, however, to re-establish the status quo ante. In the meantime, Charles M. Thoms, a stockholder of the Eastman Company, filed a bill in the Court of Chancery of New Jersey alleging as his cause of action the same matters which the Eastman Company in the action at law had by its answer set up as an equitable defense. Thoms' equity suit and the Eastman Company's equitable defense differ only in that one is employed on attack and the other in defense, each using the same weapons and each seeking the same relief, with the difference that in Thoms' suit he prays that the Custodian's action at law be enjoined and asserts, in substance, that because of his ignorance of what had been going on for a quarter of a century, he is not subject to the doctrine of laches, which, doubtless, he apprehended, might be invoked against the Eastman Company. After the removal of Thoms' suit from the state court to the District Court, the equitable defense in the action at law was transferred to the equity side of that court and was heard together with Thoms' equity action. The learned trial court, construing the agreement of 1903, considered the questions there, and now here, involved, whether the stock was issued for a consideration illegal (a) at common law, or (b) under the Sherman Anti-Trust Law (15 USCA § 1 et seq.); whether the stock in question was issued for "property" within the authorization of sections 48 and 49 of the New Jersey Corporation Act (2 Comp. St. 1910, p. 1630); and whether the complainant Thoms or the defendant Eastman Company is estopped because of laches to assert their respective positions. There is no question of fraud in the case.

The learned trial judge dismissed the equitable defense of the Eastman Company in the law action and then, being back on the law side of the court, entered summary judgment in favor of the plaintiff. Also for the same reasons, he dismissed Thoms' bill in equity. Thereupon both losing parties took these appeals which were heard at the same time and will be disposed of in one opinion.

What we shall say will apply equally to both actions, except when expressly distinguished. We shall, for convenience, address discussion to the Eastman case.

The contract between the Eastman Company and the Dresden Company was produced by the plaintiff on the defendant's prayer for oyer. Thereafter it became not only the center of the case but practically all of the case, for the remaining averments of the answer are, in the main, conclusions drawn from the contract itself. As there is no evidence of the proposed or practical effect of the contract, we shall, following the parties, endeavor to find from the contract— within its four corners—its purpose and legal effect. That this may be done in several ways with different results is evidenced by the work of the several distinguished counsel. It all depends on how one reads the instrument, whether stressing certain covenants and passing others lightly, or reading each covenant in relation to every other covenant and thus arriving at a legal valuation of the whole instrument. Merrill-Ruckgaber Co. v. United States, 241 U. S. 387, 392, 36 S. Ct. 662, 60 L. Ed. 1058; 2 Williston on Contracts, § 618.

The contract has twelve paragraphs. With only the first three and the eleventh is the Eastman Company impressed. These, it says, constitute a contract in restraint of trade and therefore contain an illegal consideration for the stock, which was void then and is void now. All else is incidental.

The first and eleventh paragraphs provide that during the continuance of the agreement, which shall run for one hundred years, the Dresden Company and its associated concerns shall not manufacture, deal in or sell Collodion papers in North America, Great Britain, France, Spain and Portugal, and the Eastman Company shall not manufacture, deal in or sell the same products in any country of Europe except Great Britain, France, Spain and Portugal, with mutual covenants against disclosing trade secrets and processes to anyone in the territory of the other.

Had the contract stopped there, it certainly would look like a gentlemen's agreement to divide the world into non-competitive areas, and would be bad. But even the Eastman Company, while insisting this was the purpose and effect of the contract, admits that this is not all of it, for the Dresden Company exacted, and the Eastman Company prom-

ised, something more than peaceful trade occupation of the territory reserved in return for the territory surrendered. It demanded something in place of the profits it had previously made in that territory. Therefore the contract next provides that the profits which the Dresden Company had made in its business of manufacturing and selling Collodion papers in Great Britain, France, Spain and Portugal should be ascertained by designated chartered accountants on an agreed basis of cost. And then—finally, as the Eastman Company reads the contract—the parties agreed by paragraph 3 that:

"As the consideration for the covenant on the part of the associated concerns hereinbefore contained, the Eastman Company shall and will, within thirty days after a Certificate in writing of the said Accountants as to the total amount of such profits for Great Britain (and later for France, Spain and Portugal) shall have been received by the Eastman Company, allot and issue to the Dresden Company fully paid up Common Shares of the Eastman Company of $100 each to such an amount which shall at the par value thereof be equal to ten times the amount of the said profits," which, later issued, are the shares in question.

Again, had the contract stopped there (as the Eastman Company claims it did in its real purpose) there still would be a question whether the Eastman Company bought territorial rights to which the business of the Dresden Company was a mere incident, or bought the business of the Dresden Company to which the territorial rights were merely incidental and protective.

We shall now look at the remainder of the contract in order to determine precisely what was the consideration for the stock issue and accordingly whether it was legal or illegal first under federal law and next under state law.

The 1903 agreement refers in its preamble to a contract between C. Christensen and the American Aristotype Company, executed in 1894, which by reference and annexation is made a part of the contract here in question. That early contract shows that Christensen, a German, had invented a secret process for making Collodion photographic printing-out paper, the formula for which was a trade secret known only to himself. The parties agreed that Christensen should come to America and demonstrate the value of his process and, if satisfactory, the Aristotype Company should pay him a named money consideration for a disclosure of his process

and the exclusive right to use it and sell its products everywhere except in Europe and England and that Christensen should use it nowhere except in Europe and England. The demonstration proving satisfactory, the contract was executed by the disclosure of the process on the part of Christensen and the payment of money on the part of the Aristotype Company.

This contract, when executed, was a typical sale of property with a restrictive covenant against competition by the vendor, valid in law. The validity of the contract was heightened, if possible, by the character of the property—a grant of rights in a secret process. John D. Park & Sons Co. v. Hartman (C. C. A.) 153 F. 24, 30, 12 L. R. A. (N. S.) 135; Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 402, 31 S. Ct. 376, 55 L. Ed. 502; Fowle v. Park, 131 U. S. 88, 9 S. Ct. 658, 33 L. Ed. 67; Ammunition Co. v. Nordenfeldt, L. R. 1 Ch. Div. 630, 1893. Indeed, the Eastman Company admits that the legality of the Christensen contract is not open to question.

Between 1894 and 1903 the rights reserved by Christensen in his process were acquired by the Dresden Company, and the rights granted to the Aristotype Company were acquired by the Eastman Company. For aught the record shows both companies still practice the process within their respective territories.

But Christensen, because of the necessity of his consent in writing to any change in the Christensen-Aristotype contract, was a party to the 1903 contract. As the Christensen contract was admittedly valid, its extension to four European countries would seem to be equally valid and the stock consideration given therefor pro tanto valid. But the 1903 contract is not limited to dealing in Collodion papers made by the Christensen process. From the generality of its terms, it extends to dealing in "any Collodion" papers made by any process. We agree with the Eastman Company in its interpretation of the restrictive covenants that they include all Collodion papers made or to be made by one company or the other under any process.

Whether the Dresden Company was at the time of the contract making Collodion papers otherwise than by the Christensen secret process and selling them in Great Britain, France, Spain and Portugal does not appear. However, in order to meet the question frontally, we shall assume it was. Then, manifestly, the Dresden Company was engaged in the business of selling Collodion pa-

pers in those countries. Aside from the restrictive covenants as to territory (1 and 11) and the covenants as to consideration (2 and 3), by which it engaged to stop business and step out of those territories, the Dresden Company agreed to a number of things in respect to its then current business and the future business of the Eastman Company. As we have already said, it extended to the Eastman Company the exclusive right to use the Christensen process in the aforenamed European countries. In doing so the Dresden Company surrendered the right to use its own process there and thus gave a thing of value in return for shares of stock. To assist the Eastman Company in taking over its business, the Dresden Company agreed to supply it with all Collodion papers it should require for a period of eighteen months at cost, and at ten per cent. above cost for three years thereafter. In order to enable the Eastman Company to gain control "of the present trade in Collodion papers" the Dresden Company promised forthwith to furnish the Eastman Company the names and addresses of its customers and full particulars of the terms of sale and also to render the Eastman Company and its agents, free of charge, all information and assistance that might .be necessary "for such purpose.". It next promised to act as agent of the Eastman Company, at its option, for the sale of Collodion papers in the four countries under an arrangement to be made as to division of profits. The Dresden Company then gave the Eastman Company the right to sell its Collodion papers in the designated countries under any of the labels and marks which the Dresden Company had used theretofore. It was further stipulated that, should the agreement be extended to France, Spain and Portugal (as later it was on the Eastman Company's "purchase" of the business in those countries), the Dresden Company would cause to be transferred to the Eastman Company the entire right, title and interest of E. van Bosch in a certain contract with Poulanc Freres "without further consideration" and, if asked by the Eastman Company, would furnish "the goods required under said contract at cost." And, finally, the Dresden Company and Eastman Company, each for itself, agreed to protect the other from the introduction of their respective papers in the territory of the other.

From this recital there can be no doubt that the Dresden Company had a going business in Collodion papers in Great Britain, France, Spain and Portugal before the Contract of 1903 and that after the contract it had no such business in those countries. That it did not abandon its business, or give it to the Eastman Company, is very certain. That it disposed of it to the Eastman Company for a highly valuable return is equally certain. Manifestly, therefore, at least one of the purposes of the contract was the sale of the business of the Dresden Company within a prescribed territory and its purchase by the Eastman Company.

Is a going business a subject of barter, and is it a valid consideration for money, or shares of stock, the equivalent of money? That may depend on the nature of the business. A business does not consist alone of land and factories, raw materials and finished products. It not infrequently happens that these are the least valuable things in a successful business. Trade in the form of satisfied customers, good will which insures sales, far flung sales organization which makes for wide distribution, excellence of the product which withstands competition, rights in patents or secret processes, low manufacturing costs, a record of consistent earnings through the years, though intangible, are, nevertheless, things that enter vitally into a business and actually into its value. Here the business of the Dresden Company was of sufficient substance to earn very substantial profits which were accepted and used by both parties in determining the consideration to be paid for it in the form of shares.

From all that transpired it appears to us that what was intended and accomplished by the parties was a sale of the business of one party for shares of stock of the other and that the restrictive covenants, involving an extension of territory within which the purchaser might carry on the business and a restriction of territory which would prevent the seller molesting the purchaser in the conduct of the business it had bought, were but incidents—necessary because protective—to the business purchased.

We are constrained to hold that the consideration for the shares of stock in suit comprised not merely the restrictive covenants as to territory but all covenants running from the Dresden Company to the Eastman Company, that the consideration was lawful, that the contract was not in restraint of trade and therefore the issue of stock is not void under the common law or under federal law.

The next question is whether the stock in suit is void under the laws of New Jersey,

the state in which the Eastman Company was incorporated.

■ The Corporation Act of New Jersey (Revision of 1896, P. L. 1896, p. 277) provides (by section 48 [2 Comp. St. N. J. 1910, p. 1630]) that:

"Nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under this act, except as hereinafter provided in case of the purchase of property. * * *"

Section 49 [2 Comp. St. N. J. 1910, p. 1630] provides:

"Any corporation formed under this act may purchase (sundry things including) other property necessary for its business, and issue stock to the amount of the value thereof in payment therefor. * * *"

Thus it is plain that the stock in this case could validly be issued only for money or property. If issued for anything else it would be contrary to these provisions and would be void. Tooker v. National Sugar Refining Co., 80 N. J. Eq. 305, 84 A. 10. Of course, if, as Thoms alleges and the Eastman Company contends, "the stock was issued in consideration of the restrictive covenants, and for no other consideration," the stock would, under New Jersey law, be void, for such covenants are neither money nor property. But having held that the stock and the restrictive covenants were not considerations one for the other and that the sale of a business was the consideration for the stock, there yet remains the question whether the business of the Dresden Company was "property" within the meaning of the New Jersey law permitting a valid issue of stock "to the amount of the value thereof in payment therefor." Keeping in mind the character and volume of the business of the Dresden Company as disclosed by the contract of 1903, we have, with the assistance of counsel, searched the New Jersey cases for judicial interpretations of the statutory word "property." Foremost among those brought to view by the Eastman Company is See v. Heppenheimer, 69 N. J. Eq. 36, 43, 61 A. 843, wherein "property" is defined "to be something visible and tangible." These words, however, are not so definite and arbitrary when read in the opinion as when baldly quoted in the briefs. The See v. Heppenheimer Case concerned the capitalization of future profits anticipated as a result of suppressing competition,—the capitalization of a hope. In holding that such unrealized profits were not property within the meaning of the New Jersey act, the court gave expression to the quoted words which, in view of the context, were doubtless apposite. But that the court meant nothing more than to apply them to the facts of that case is plainly shown farther on in the opinion where it quoted and adopted Judge Lacombe's ruling that good will of a business is property. Washburn v. National Wall-Paper Co. (C. C. A.) 81 F. 17. While some visible and tangible things, such as lists of customers, passed from the Dresden Company to the Eastman Company in this transaction, they were but elements to the thing sold, which was the "business," and it was for the business that the stock was issued to "the value thereof"—about which there is no question—and "in payment therefor." Admittedly this business, though very real and very profitable, was not in its entirety visible and tangible. But the construction of the word "property" by the highest courts of New Jersey neither started nor stopped with the See v. Heppenheimer Case. Indeed, we find New Jersey cases, preceding and following that decision, which depart radically from the literalism of the quoted words. New Jersey courts have in a wide range of decisions regarded as property forming the bases of valid stock issues many invisible and intangible things, such as work and labor done, Vineland Grape Juice Co. v. Chandler, 80 N. J. Eq. 437, 85 A. 213, Ann. Cas. 1914A, 679; good will, leases and contracts, Donald v. American Smelting & Refining Co., 62 N. J. Eq. 729, 48 A. 771, 1116; the name and trade of a partnership business, Stephany v. Marsden, 75 N. J. Eq. 90, 97, 71 A. 598; Id., 76 N. J. Eq. 611, 75 A. 899; lease without rent, embracing a covenant for arc lights free of charge, Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 162, 82 A. 618; Id., 82 N. J. Eq. 364, 91 A. 1069; inventions, patents and applications for patents, Easton National Bank v. American Brick & Tile Co., 70 N. J. Eq. 722, 724, 64 A. 1095; Robbins v. Ideal Wheel & Tire Co., 93 N. J. Eq. 293, 115 A. 525; license under a patent, McMahon v. Pneumatic Transit Co., 85 N. J. Eq. 544, 546, 96 A. 999; trade marks and good will, Goodnow v. American Writing Paper Co., 73 N. J. Eq. 692, 693, 69 A. 1014; See v. Heppenheimer, 69 N. J. Eq. 36, 44, 61 A. 843.

On these authorities we hold that the business of the Dresden Company, already found a valid consideration for the shares under federal law, was "property" in contemplation of the New Jersey statute and that the stock

which the Eastman Company issued in payment for it was lawfully issued and is valid. As these findings definitely and completely dispose of the cases on their merits, we are not inclined to protract the discussion by the consideration of other questions which, however decided, would not change the result.

The decree in No. 4512, the decree in No. 4513 and judgment in No. 4514 are affirmed.