## KENTUCKY NATURAL GAS CORPORATION v. INDIANA GAS & CHEMICAL CORPORATION et al.

### No. 7392.

Circuit Court of Appeals, Seventh Circuit.

March 14, 1941.

Frederick E. Matson, James A. Ross, Harry T. Ice, and Merle H. Miller, all of Indianapolis, Ind., for appellant.

Paul Y. Davis, of Indianapolis, Ind., for appellee.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

In this case the Kentucky Natural Gas Corporation sought to recover triple damages under § 7 of the Sherman Act, as amended by § 4 of the Clayton Act, for the alleged violation by defendants of § 1 of the Sherman Act. 38 Stat. 731, 15 U.S.C.A. § 15, 26 Stat. 209, 15 U.S.C.A. § 1. The defendants moved to dismiss the complaint for failure to state a cause of action, the District Court dismissed the complaint, and the plaintiff appealed from the judgment of dismissal.[1] The main ques-

---

[1] The complaint rested jurisdiction on the federal statutes and on diversity of citizenship. The plaintiff is a Delaware corporation, the corporate defendants are Indiana corporations, and the individual defendants are citizens of Indiana, New York, Massachusetts and Virginia.

In this opinion the following designations may be used: "Kentucky" for Kentucky Natural Gas Corporation, plaintiff; "Indiana" for Indiana Gas and Chemical Corporation, defendant; "Universal" for Universal Gas Company, defendant; "Terre Haute distributor" for Indiana Gas Utilities Company; and "loop distributor" for Public Service Co. of Indiana.

tion presented is whether the complaint charges a conspiracy in restraint of interstate trade within the purview of § 1 of the Sherman Anti-Trust Act. The pertinent allegations are summarized below.

The plaintiff produces natural gas from wells in the state of Kentucky, which it transports by pipelines through western Indiana. This pipeline runs past Terre Haute where the defendant Indiana manufactures coke-oven gas, mixes it with natural gas purchased from plaintiff and supplies the artificial gas to a local public utility distributing in the Terre Haute territory. The defendant Universal owns pipelines extending across central Indiana and feeding municipalities in the loop territory, it purchases artificial gas from the defend-ant Indiana and it then resells the gas to a local utility distributing in the loop area.[2] Defendant Ogle is director, president and general manager of both corporate defendants; defendant Wilson is secretary and treasurer of both corporate defendants; defendant Comin is a director of Universal; and the other individual defendants are directors of Indiana.

On September 1, 1935, the corporate parties to this action executed three contracts intended to govern their business relations until October 31, 1947. Together these contracts provided for the supplying by Kentucky of natural gas and for the good-faith effort by Universal and Indiana to effect a change-over in their respective contracts with the local utility distributors from artificial gas to natural gas.[3] Re-

[2] The straight natural gas sold in interstate commerce by plaintiff has a calorific value of approximately 1,000 British Thermal Units per cubic foot. The artificial and mixed gas sold in local commerce by the corporate defendants possesses a calorific value of 570 B. T. U. per cubic foot.

The Terre Haute territory includes Terre Haute, West Terre Haute, Clinton and Brazil. The loop territory includes Martinsville, Bloomington, Bedford, Mitchell, Franklin, Columbus, Seymour and Greencastle. The Indiana Gas Utility Company, local distributor in the Terre Haute territory, is designated "I. G. U. C." and the Public Service Company of Indiana, local distributor in the loop territory, is designated "P. S. C. I."

The following diagram should help to visualize the pre-contracts position of the corporate parties in this case.

570 B. T. U. Value." (2) After change-over, Universal will purchase Natural gas from Kentucky. (3) Pending change-over, Indiana shall continue sale of 570 B. T. U. gas to Universal.

Kentucky-Indiana. Contract. (1) Indiana "contemplates entering into a new contract" with the Terre Haute distributor for change-over from 570 B. T. U. gas to straight natural gas or a gas of higher than 570 B. T. U. value. (2) Pending change-over, Kentucky shall continue to sell as much natural gas to Indiana as it needs for supplying 570 B. T. U. gas to Universal and the Terre Haute distributor. (3) After change-over, Kentucky shall sell as much natural gas as it needs for supplying natural gas (or gas of higher than 570 B. T. U. value) to the Terre Haute distributor. (4) During life of contract, Kentucky shall not "sell natural gas to others than Buyer [Indiana] for

State of Kentucky | State of Indiana

Kentucky — Natural Gas → Indiana (Manufacturer)

Artificial Gas → I. G. U. C. (local distributor) → Consumers Terre Haute Territory

Artificial Gas → Universal → P. S. C. I. (local distributor) → Consumers Loop Territory

[3] The relevant parts of the three contracts are summarized as follows.

Indiana-Universal Contract. (1) It is "contemplated" that Universal "will negotiate" with the Loop distributor "for a change-over as soon as possible from mixed gas [570 B. T. U.] * * * to straight natural gas [1,000 B. T. U.] * * * or a mixed gas of higher than

consumption" in the Terre Haute territory.

Kentucky-Universal Contract. (1) Universal "contemplates entering into a new contract with" the loop distributor for change-over. (2) Universal "agrees to endeavor to modify its contract with" the loop distributor "as soon as possible." (3) After change-over, Kentucky shall

strictive covenants in the Kentucky-Indiana and Kentucky-Universal contracts prevented Kentucky from selling natural gas in the Terre Haute and loop territories independently of the corporate defendants.

The complaint asserts that plaintiff contracted with the corporate defendants with the intention of increasing its sales of natural gas in the Terre Haute and loop territories. It agreed to be bound by restrictive covenants "providing that plaintiff should not sell or distribute straight natural gas in any of said territories excepting through said defendant companies," because it expected and contemplated in return that the corporate defendants, pursuant to their contracts, would bring about a prompt change-over with resultant increase in sales of natural gas. It is pointed out that natural gas is a fuel superior to manufactured or mixed gas and that it "can be supplied by plaintiff, either through defendant corporations or the local distributing companies, to the consuming public in the territory and markets supplied by defendant corporations at a much lower cost per heat unit than the consumers in said areas are now paying for mixed gas furnished by said defendants."

The complaint further asserts that the defendants conspired to prevent for the duration of the contracts, the use of straight natural gas for distribution to consumers in the Terre Haute and loop territories, that is, that they planned to obtain "the greater profit to be derived from continuance of the sale of mixed gas of low heating value at a price far in excess of the price per unit of heat of natural gas." Pursuant to the conspiracy, the defendants induced plaintiff to contract with the corporate defendants by representing that negotiations with the local distributors had already been undertaken for a change-over to natural gas and that grounds existed for the belief that a change-over could be arranged immediately. In addition the conspirators refused to negotiate in good faith with the local distributors and resorted to detailed acts by which they compelled Universal's noncompliance with its contracts. Instead they engaged in "pretended negotiations" which were of such a character, as to prices and terms, as to be impossible of acceptance by the distributors and which were made with the intent to obstruct any agreement for use of natural gas.

The complaint also states that the contract prices and terms on which plaintiff was to supply natural gas to the corporate defendants were such as to enable them to deal satisfactorily with the local distributors. Moreover the distributors themselves have been ready and willing for at least two years to supply natural gas to their customers (which could be furnished at a much lower cost per heat unit than the artificial gas) but they have been prevented from so doing by the plan, scheme and conspiracy of the defendants. It is alleged that had the pre-contracts representations been true and had the change-over negotiations been carried out in good faith, a change-over to natural gas could have been effected within six months from the date of the contracts. As a result of the plan, scheme and conspiracy, as agreed upon and carried out, no change-over has ever been effected, restrictive covenants obligating plaintiff not "to market its natural gas in any or either of said territories" have had the effect of obstructing and preventing any sale or distribution of straight natural gas in any of said territory, and the sale and transportation of natural gas in interstate commerce has been unreasonably restrained, to the damage of the plaintiff and the detriment of the public interest, in violation of Section 1 of the Sherman Anti-Trust Act."

The Sherman law is violated when traders conspire to exclude an interstate trader from a particular market. The same result follows whether the trading is done in the same product or in competing products. In the instant case the pleader tells us that suppliers of artificial gas have conspired to close the Terre Haute and loop markets to an interstate supplier and vendor of natural gas. The conspirators have indulged in conduct the necessary effect of which has been to utilize these markets for the exclusive sale of artificial gas and to prevent the use of these markets for the sale of natural gas. The inevitable result was an obstruction to the sale of natural gas in interstate commerce, injury to the interstate trader, and deprivation to the consuming public of the advantages in-

sell Universal its natural gas requirements. (4) During life of contract, Kentucky shall not "sell natural gas to other than Universal Gas Company for consumption" in the loop territory, but this restriction shall cease if the loop distributor has not changed over to straight natural gas by September 1, 1938.

herent in a superior and more economical fuel. We hold that the scheme alleged by the pleader plainly falls within reach of the Sherman law. To what extent the injury must be left for proof. Perhaps the pleader will be unable to establish his allegations but he is entitled to a chance to prove them.

Counsel for defendants makes much of the fact that apparently on September 1, 1935, the corporate defendants were the exclusive suppliers for the Terre Haute and loop distributors. From this counsel infers an impossibility of competition by plaintiff, and consequently he concludes there was no restraint upon competition in the market for plaintiff's product. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R.. 1044. We note that the inference drawn by counsel is neither necessarily true nor the only one permitted under the circumstances. Certainly, if true, it was surplusage to inject covenants not to compete against the corporate defendants in the Kentucky contracts of September 1, 1935. Nor does it follow, assuming that plaintiff was unable to supply natural gas directly to the distributors, that counsel's conclusion expressed above is correct. As we shall show later, we think that the inference proves too much and that the conclusion based thereon is unwarranted in view of the factual picture painted by the pleader.

The Terre Haute and loop distributors desired natural gas and were ready to take and supply it to their customers. Plaintiff was able and willing to supply the Terre Haute and loop areas with natural gas, and its participation in the 1935 contracts is sufficient indication of its intention in this regard. It would not be unreasonable to presume that the municipalities served by the utilities would insist upon a superior and more economical fuel, and certainly the consuming public was in position to benefit from the presence of a competing product or from the substitution of a better product. Even the defendants professed a willingness to supply these markets with natural gas. Moreover it appears that the contracts to supply gas to the local utilities for distribution, permitted a change in the quality of gas. This view is supported by the change-over dealings in 1935, and by the reality that contracts to supply gas must take into consideration the statutory law which empowers municipalities to control the quality and character of gas to be furnished by the public utility, 10 Burns, Ind.Stat.Anno., 1933, §§ 54-614. These facts and circumstances lead to the conclusion that on September 1, 1935, competition existed in the Terre Haute and loop markets for natural gas, and that on that date the corporate parties to this action were in effect competing for the right to supply the Terre Haute and loop distributors with a product for resale to the consuming public.

█ Counsel for defendants also contends that if the conspiracy was illegal, the plaintiff was a party to it and therefore can not maintain an action against the other parties. The answer to this is that plaintiff was not one of the conspirators. Plaintiff was a victim of the conspiracy, as was the consuming public in the Terre Haute and loop territories. And rather than to acquiesce in the illegal restraint of trade caused by the conspiracy, plaintiff brought this suit. Counsel for defendants points to the covenants not to compete, in themselves restraints of trade. But these restrictive covenants constitute reasonable restraints, sanctioned at common law and spared the condemnation of the Sherman law. Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 406, 407, 31 S.Ct. 376, 55 L.Ed. 502; Thoms v. Sutherland, 3 Cir., 52 F.2d 592, 596. These voluntary restrictions were part of the consideration paid for the change-over promises of the corporate defendants. If the defendants had not conspired to prevent the change-over, plaintiff's product would have been introduced to the Terre Haute and loop markets, and the consuming public would have received a superior and economical fuel. Manifestly the plaintiff is not in pari delicto with the defendants.

█ The obvious purpose of the conspiracy was to utilize the two markets for the exclusive sale of artificial gas and to prevent the use of these markets for the sale of natural gas. This restraint of trade was accomplished mainly by the 1935 contracts: (1) the conspirators induced restrictive covenants by making change-over promises, thereby eliminating any direct competition; (2) after tying plaintiff's hands in this way, they prevented a change-over to plaintiff's product, thereby maintaining their own product on the markets and at the same time keeping out the competing product, all at the expense of plaintiff and the consuming public. The

necessary effect of the acts complained of, was to obstruct the sale of natural gas in interstate commerce. We conclude therefore that the conspiracy alleged by the complaint, one intended to prevent the sale of a competitor's product in interstate commerce, violates the Sherman law.

The judgment of dismissal is reversed and the case is remanded to the District Court, with instructions to proceed in accordance with this opinion.