The bill seeks to hold the defendant, trustee, liable for the loss of the once market value of two hundred and nine shares of the capital stock of the Island Development Company, due, as alleged, to the trustee's failure and refusal to sell them when the price was high and the time was ripe. The charge is that: "Said trust company neglected so to do and willfully and/or purposely refused or refrained from doing so and thereby occasioned a loss to complainant of $110,000, and has continued said investment not only negligently and not in the exercise of good faith and reasonable discretion but in the exercise of positive bad faith so that a loss of $110,000 has been caused to complainant for which the trustee should be held accountable."
At the outset, it is just to say that there is nothing in the evidence to warrant the charge of bad faith or willful or purposeful refusal to sell; but I apprehend the complainant need not have been so drastic to recover. *Page 603 
The whole affair centers in the rise and fall of the development of Brigantine Beach, an island of two thousand seven hundred acres, north and adjacent to Absecon Island upon which Atlantic City, "the playground of the world," was built.
In 1922, a small group of men obtained an option to purchase seventy per cent. of the island, then waste land, for $300,000, upon a payment of $5,000 for the option. (Later, all but about five per cent. of the island was purchased.) They incorporated the Island Development Company, assigned to it the option, took title in its name, gave a purchase-money mortgage in return, and launched a prodigious enterprise — Brigantine City. More than $12,000,000 was spent in building a causeway and bridge connecting Atlantic City, an imposing hotel, a golf course, in dredging and filling in land, in constructing fifty miles of streets, one hundred miles of sidewalks, twenty-five miles of water main, ten miles of sewer, fifteen miles of lighting, a mile and a half of boardwalk, a steel pier and other structures, all from the sale of lots, borrowed money and $100,000 proceeds of capital stock. Brigantine City is a municipality. The lot developments and sales were in sections, the first at the most southerly end of the island, nearest Atlantic City; the second and third adjoin, in their order, and were put on the market consecutively. The three offers of lots were met with quick and hearty response, and all, or nearly all, six thousand, were promptly disposed of at high prices, fifty per cent. in cash installments, the balance upon mortgage; a single day's sales reached over $5,000,000. In 1927, the real estate boom had reached its peak and was on the turn. The public had lost interest in this form of investment, the decline set in, the collapse followed and Brigantine lay prostrate. Fifteen hundred acres of unimproved land remained; unsold lots, the hotel, golf course, the bridge and other creations, in fact, the whole institution stood frozen, with millions of debts outstanding. The assets were turned over to a newly formed corporation for conservation and the protection of creditors. That company is now in the hands of a receiver. *Page 604 
Characterization of the enterprise as a bubble is an undeserved stigma. It was undertaken and promoted by men of character and integrity and of responsibility, moral and financial, in good faith, with inviting prospects of profitable accomplishments. They visualized another great seaside resort like its neighboring prototype, whose environs, Ventnor, Margate City and Longport, were not nearly so promising when projected. The time was propitious for the development of Brigantine and the public's reception, displayed in the enormous purchases of lots, at high prices, was substantial assurance that the promotion was opportune. There can be little question that another renowned seashore community would have come into being had normal times continued, nor that when they are restored there will be a spontaneous revival, for the location, its accessibility, the horde of lot owners, its appointments and conveniences, all speak potential values which need only national prosperity for their stimulation.
Edward G. Harris, the complainant's father, was one of the organizers of the Island Development Company. He had five of the ten shares of the subscribed capital stock, par $100, for which he presumably paid $500. He died in 1923 while the first subdivision was in progress. His estate was inventoried and appraised at $45,000, of which the five shares were a part, appraised at $500. By his will he gave his estate to his executor and trustee, Atlantic Safe Deposit and Trust Company of Atlantic City (since merged into the defendant, Guarantee Trust Company) in trust, to divide the residue of his estate equally between his widow and daughter, then an infant, to hold the daughter's share during her infancy, and pay the income to his widow for her support, "with full power and authority on the part of my said executor and trustee to grant and convey any of the said property at such time and for such price and upon such terms as to them shall seem advisable."
Shortly after the Island Development Company was organized, its board of directors, deeming the option, for which the promoters, as the Island Holding Company, had paid $5,000, to be worth $100,000 plus the $5,000, resolved to purchase *Page 605 
the option for one thousand and fifty shares of the capital stock of the Island Development Company. Of this, Mr. Harris was entitled to one-tenth, one hundred and five shares, for he had contributed one-tenth of the $5,000, but the division was not made until after his death, and the one hundred and five shares came to the executor. After the third subdivision was launched, the company declared a one hundred per cent. stock dividend in July, 1925, which brought to the estate an additional one hundred and five shares. A second stock dividend of ninety per cent. followed, February 1st, 1926, producing an additional one hundred and ninety-eight shares, a total of four hundred and eighteen shares, all evolved from the $1,000 investment. The shares to the Island Holding Company for the option, later divided, were unearned increments and the stock dividends did not represent earnings, for they were based upon an assumed enhanced value of the enterprise, estimated upon its past performances and favorable prospects. This would appear to be so, because a fifty per cent. dividend of the earnings was declared a month following the second stock dividend, in surplus purchase-money mortgages at seventy-five per cent. of their face value, a total net of $640,000 and a net to the estate of $37,000. The discount, probably, was to allow for anticipated defaults, although the mortgages were nearly all realized, and, perhaps, to meet income tax exactions.
The promotion of Brigantine Beach and its promise of vast fortune to its promoters spread quickly, far and wide. The original stock issue of one thousand and fifty shares attained a market value of $2,000 a share, and many conservative investors purchased at that price, and at that rate for shares of the first and second stock dividends, and anxiously sought them. Wise and careful business and professional men purchased; scores of them are on the roster of stockholders; all felt, no doubt, they were making safe and profitable investments, for Brigantine was off to a fine start, lots were selling at stupendous prices and vast returns to stockholders were imminent to the ken of those well informed and capable of judging. The standard prices prevailed from *Page 606 
June, 1925, until February, 1927, when the collapse came suddenly, practically overnight; local banks refused to further carry the shares as collateral and called the loans. There was no market after that.
Failure to sell the complainant's stock before the collapse is charged as neglect of duty and breach of trust — stock, which in one breath she denounces as born of a bubble (which her father helped blow) and should have been unloaded upon an unsuspecting public, and in the next argues was worth $110,000 at which she puts her damage. But passing the stultification: Up to the time the bottom fell out of the market, public faith in the stock was firm; in stockholders it was staunch. Brokers' clients were seekers, not sellers. There were willing buyers, but stockholders were reluctant; they were confident, held tight to their shares and were "sitting pretty," as they believed. Nothing had interrupted the progress of the enterprise, it was functioning smoothly with the outlook serene. There had not been a fleck, not a discordant note to disturb the trustee's confidence in the solidity of the investment, nothing to provoke a change; its financial troubles followed upon the break in the credit of the stock and reached its serious stage in August, 1927. With stockholders tenaciously holding on, if their expectations had been realized, a sale of the stock at that time would have reaped censure as vehement as the present condemnation.
A trustee who, within the scope of his powers, acts in good faith, prudently, carefully, diligently, discharges the obligations of his trust; he is not responsible for errors of judgment. Heisler v. Sharp's Ex'rs, 44 N.J. Eq. 167; Beam v.Paterson Safe Deposit and Trust Co., 83 N.J. Eq. 628; In reLeonard, 107 N.J. Eq. 235; In re Corn Exchange National Bank,109 N.J. Eq. 169; In re Pettigrew, 115 N.J. Eq. 401; Peoples NationalBank, c., of Pemberton v. Bichler, Ibid. 617.
The president and trust officer of the Atlantic Safe Deposit and Trust Company and two directors, were also directors of the Island Development Company. They were contributors to the $5,000 option price and recipients of the various stock *Page 607 
and mortgage dividends just related. The two and a brother of the deceased Harris purchased the option, evolved the scheme of development and were the managing directors of the Island Development Company and the master minds of the promotion; the president and trust officer was just another director. Because the three sold some of their stock, the complainant charges the trustee with bad faith in not selling her shares. The following transactions, it is claimed, reflect the bad faith of the trustee:
The president and trust officer acquired in all two hundred and sixteen shares before the collapse in February, 1927. From 1925 to that time he sold forty-eight shares in five different lots, five, ten, three, five and twenty-five shares respectively. He transferred ten shares to his son and, after the collapse, eighty-five shares, and to his partner forty-six shares. The sales of forty-eight shares to strangers were sought, the stocks were not offered. Whether the transfers by father to son were sales is not clear; be that as it may, sales to the son evinced confidence of both in the shares. The transfers of forty-six to the partner were divisions not sales; the two were partners in contributing to the $5,000 option price and joint beneficiaries. Counsel refers to three transfers of five shares each, found in the transfer book; it does not appear that they were sales.
One of the managing directors owned four hundred and seventeen shares and sold one hundred, in parcels (the stock transfer book, it is said, shows one hundred and twenty transferred) to raise money to put into the hotel.
The other managing director and president of the Island Development Company apparently held five hundred and twenty-four shares. Of these he sold thirty-four shares and transferred to his brother thirty-two and one-half shares; that the latter were sales is not shown.
Obviously, the few sales were not selfish, and it is far from the truth that when they were made "the handwriting was on the wall. Belshazzar's feast was about over, and although all three — Thompson, Bacharach and Fisher — of the development company's directors, who were also directors of the *Page 608 
trust company, started in upon a campaign to sell their own stock, they ignored that in which the complainant was interested, but took pains to sell a large part of their own holdings." The three went down with the ship.
The bill will be dismissed.