The complainants, Harry Helfman, of Detroit, Michigan, and Stockton Cranmer, of Somerville, this state, bring this suit as stockholders of American Light and Traction Company, a New Jersey corporation (hereinafter termed "American" for brevity), for the benefit of said company against certain individuals who are or formerly were directors of American Light and Traction Company, and against The United Light and Power Company (hereinafter termed "United"), The Koppers Company of Delaware (termed "Koppers"), The United Light and Railways Company and other corporations named in the bill of complaint.
The total outstanding stock issued by the American Light and Traction Company at the time this bill was filed totaled two million seven hundred and sixty-eight thousand six hundred and thirty-two shares of common and five hundred and sixty-nine thousand four hundred and forty-eight shares of preferred, of which common stock complainant Helfman held five thousand seven hundred shares or approximately seventeen one-hundredths of one per cent. of the total, while complainant Cranmer was the owner of only ten shares of the common stock. *Page 3 
The bill of complaint sets forth three causes of action.
The first cause of action is predicated upon a series of transactions which occurred in July, 1928, and will herein be generally referred to as the "1928 Transaction." It consisted of the following:
1. Koppers transferred all of the outstanding stock of the Milwaukee Coke and Gas Company to American, receiving in exchange therefor thirty-eight thousand two hundred and seventy-two shares of the common stock of American.
2. American transferred one hundred and fifty-seven thousand nine hundred and forty shares of capital stock of the Brooklyn Union Gas Company (treating the small number of convertible debentures involved as though converted into stock) to corporations owned by stockholders of Koppers in exchange for debentures of such corporations of the aggregate face amount of $21,321,900, which debentures bore interest at five and one-half per cent. per annum, were callable by the holders thereof upon a year's notice and were guaranteed by Koppers.
3. United transferred thirty-nine thousand five hundred and eighty-two shares of the capital stock of the Brooklyn Borough Gas Company (the total outstanding stock being forty thousand shares) to American, receiving in exchange therefor fifty-six thousand two hundred and forty-eight shares of common stock of American.
4. American transferred the above mentioned shares of stock of Brooklyn Borough Gas Company to corporations owned by the stockholders of Koppers in exchange for debentures of such corporations of the aggregate face value of $11,249,600, bearing interest at five and one-half per cent., callable on one year's notice by the holders thereof and guaranteed by Koppers.
5. Koppers transferred to United nineteen thousand three hundred and ninety-nine shares of preferred and one hundred and thirty-nine thousand seven hundred and sixteen shares of common stock of American and received in exchange therefor debentures of the aggregate face amount of $26,872,970 and one hundred and fifty thousand shares of Class "A" stock *Page 4 
of United, together with an eighteen-months option to purchase one hundred and eighty thousand additional shares of such stock at $20 per share. The American stock transferred by Koppers to United consisted of Koppers' entire holdings of such stock, including the thirty-eight thousand two hundred and seventy-two shares of stock received as the consideration for the transfer of stock of The Milwaukee Coke and Gas Company.
6. United transferred seventy-five thousand shares of Detroit Edison stock to American, receiving in exchange therefor seventy-five thousand shares of American common stock.
It is charged by complainants that the entire transaction was conceived in fraud and consummated pursuant to a conspiracy between United and Koppers, which companies, the bill of complaint alleges, were in control of American and that the transaction resulted in loss to American.
These allegations and charges are denied by the defendants who say that the directors of American had good, sound business reasons for each part of the transaction above mentioned in which American participated; that American received full value for the securities transferred by it; that it not only suffered no loss but benefited by reason of such transaction.
The second cause of action alleges that the directors of the American were guilty of gross incompetence and neglect of duty in permitting, authorizing and approving purchase of stock of International Paper and Power and in holding said shares of stock, and that the purchase thereof was ultra vires.
The third cause of action concerns the transaction resulting in the purchase of the Detroit Edison stock in 1930. Here complainants seek to hold one Cyrus S. Eaton accountable for what they say was his profit or for the excess of the selling price over the fair value of the stock, charging that the purchase of said stock was made at an excessive figure to enable Otis 
Company and Eaton to dispose of the same and thus assist them in their financial difficulties. Complainants also seek to hold the directors liable, charging them with gross negligence. *Page 5 
Complainants pray that the defendant beneficiaries of any of the transactions complained of be required to account for all gains and profits, or for the difference between the fair value of the properties purchased and sold respectively, by the American Light and Traction Company and the prices at which said properties were purchased or sold respectively; that the decree adjudge "the liability of all the defendants, corporate and individual [other than American Light and Traction Company], and each and every one of them for the losses and damages," and that all of them be required to account and pay over to American, such losses and damages which the American has sustained, "because of the fraudulent, wrongful and unlawful acts and omissions, including neglect of duty and bad faith, of said defendants in committing, consummating, participating in, authorizing, consenting to, permitting, approving, ratifying and/or failing or neglecting to oppose or vote against the transactions mentioned in the first, second and third causes of action of this bill of complaint."
The 1928 transaction and the result thereof to American was as follows: *Page 6 
[EDITORS' NOTE: TABLE IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 7 
American Light and Traction Company was organized in 1901 and was operated as a holding company. Its largest investments were made in stocks of public utility companies which it operated and managed. Its charter vested the company with broad general powers to own and operate waterworks, gas, electric and steam plants, and in addition to carry on any lawful business which to the corporation seemed capable of being conveniently carried on in connection therewith, or calculated, directly or indirectly, to enhance the value of its property. It possessed power to purchase, own, hold and vote corporate shares and to exercise generally the powers of ownership thereof.
The United Light and Power Company, a Maryland corporation, also a holding company, was engaged in the operation of utilities, and owned all of the common shares of The United Light and Railways Company, a Delaware corporation, which in turn owned all of the stock of the United American Company, also a Delaware corporation. The latter corporations owned large amounts of stock of American Light and Traction Company.
The Koppers Company, a Delaware corporation, purchased stock in the American Light and Traction Company, and both United and Koppers endeavored to increase their holdings in the open market. Finding themselves in competition resulting in an increased market price, these companies entered into an agreement to purchase in future for their joint account and to divide the stock as purchased equally between them, with the result that their joint holdings by 1928 amounted to thirty-eight and fifty-nine hundredths per cent. of the voting stock.
The Koppers Company, of which Mr. H.B. Rust, one of the individual defendants, was the president, for a number of years had been engaged in the ownership and operation of by-product coke plants, gas utilities and coal mines. The chief business of Koppers was the construction, ownership and operation of by-product coke plants. Such had been its business from its organization, and for some years prior to 1924, when it made its investment in American stock. Its plants were located at strategic points along the north Atlantic *Page 8 
seaboard and a plan for expanding its coke business in that area had been formulated.
Koppers and United originally invested in the stock of American because business reverses had affected its price in the market.
Mr. H.B. Rust, president of The Koppers Company, and Mr. Frank T. Hulswit, president of The United Light and Power Company, were elected to the board of directors of American in 1924 and additional members of the operating staffs of the two companies were added to the board of directors thereafter. But it does not appear that the persons elected from these companies constituted a majority of the board.
The board of directors of American at the time of the 1928 transaction consisted of:
William Chamberlain, member of the executive committee of American, stockholder in American. Director, president, member of the executive committee and a stockholder in United. Holder of a moderate amount of stock in Continental Shares.
B.J. Denman, stockholder in American. Director, vice-president and general manager and member of executive committee of United. Holder of stock in Continental Shares; also a director of International Shares.
Cyrus S. Eaton, member of executive committee of American. Stockholder in American. Director, chairman of the board, member of executive committee of United. Partner in Otis Company. Chairman of the board, Continental Shares. Director of International Shares. Stockholder, including holdings of Founders Shares, in those investment trusts.
Richard Schaddelee. Stockholder in American, director and chairman of the executive committee of United. Holder of Founders Shares, International Shares, and of shares of Continental Shares, Incorporated. Director of International Shares.
Edgar M. Williams. Director and stockholder of United. Mr. Williams died after the hearing in this cause. His executor, United States Trust Company, was substituted as defendant *Page 9 
by consent order dated July 18th, 1933. Williams had been a director in American in 1924, before he became a director in United.
John S. Brookes, Jr., a member of the executive committee of American and a stockholder. A director and member of the executive committee of United and a stockholder. President and a director of the Koppers Gas and Coke Company, subsidiary of Koppers Company. Secretary and general counsel of The Koppers Company. The holder of Founders Shares of Continental Shares. Also secretary of Milwaukee Coke and Gas Company.
Donald MacArthur, vice-president of a subsidiary of The Koppers Company. He died not long after the 1928 transaction.
Charles D. Marshall, a stockholder in American. Director and chairman of the board and a member of the executive committee of The Koppers Company, and a stockholder.
Henry B. Rust. Chairman of the executive committee of the American and a stockholder. Director and member of the executive committee and a stockholder of United. Director, member of the executive committee and president of The Koppers Company, a stockholder. Also director and president of Milwaukee Coke and Gas Company. Also director and president of Elkhorn Piney Coal Mining Company. Stockholder in Continental Shares.
W.F. Rust. Stockholder in American. Holdings in stock of United. Director, member of executive committee and vice-president of The Koppers Company, and a stockholder. Also director and vice-president of Milwaukee Coke and Gas Company. Director and vice-president of Elkhorn Piney Coal Mining Company. Holder of Continental Shares stock.
W.C. Beckjord. Vice-president and stockholder of American. Holder of United stock.
R.B. Brown. President, member of executive committee of American, and stockholder. He became a director of United in December, 1928.
W.F. Douthirt. General counsel and vice-president of American and stockholder. Holder of stock in United. *Page 10 
A.P. Lathrop. Chairman of the board and member of executive committee of American. Holder of its stock. Holder United stock.
James Lawrence. Vice-president and secretary of American. Holder of stock.
Franklin Q. Brown. Holder of American stock. A banker, member of firm of Redmond Company.
G.A. Elliott. Stockholder in American and United. Stockholder in Continental Shares.
Marshall Field. Member executive committee of American and stockholder in American and United. Banker, member of Marshall Field, Glore, Ward Company.
W.W. Foster. Member executive committee of American, and stockholder of American and Continental Shares.
Arthur Lehman. Resigned from the board January 6th, 1931.
Martin S. Paine. Stockholder in American, United and Continental Shares.
Complainants' cause of action relating to the 1928 transaction is predicated upon the theory that a breach of trust was committed by the board of directors of American. The board consisted of twenty-one members and the ninteen members present at that meeting were unanimous in the action taken.
It is alleged that Koppers and United, then possessed of approximately thirty-eight and fifty-nine hundredths per cent. of the stock of American, and with about the same percentage of directorship, had actually dominated the board and controlled their actions and succeeded in partitioning among themselves certain assets of American, at a grossly inadequate consideration and therefore detrimental to the interests of American and its minority stockholders.
The evidence shows that of the twenty-one directors in office in 1928, twelve had been directors long before either Koppers or United bought stock in the company. Some had been for a long time employes of American. Koppers and United did not attempt to displace the personnel of the board which had been active in the management of the corporation. It is contended that these independent directors bowed in subserviency to the whip of Koppers and United. This contention *Page 11 
is founded upon an inference drawn by counsel of the complainants, not borne out by the evidence that such directors as were paid employes of American were so dependent upon Koppers and United for the continuation of their employment that they became unfaithful and disloyal.
Cyrus S. Eaton, one of the defendants and a partner in Otis 
Company and interested in certain investment trusts, it is said, dominated and controlled the entire directorate. But again the evidence introduced fails to show any influence attempted or exerted by Mr. Eaton over these directors. The part which he played in arranging these transactions was almost nil. In fact, he was not present at the meeting of the board which marked the final consummation.
The record is barren of evidence of fraud or direct personal interest upon the part of any director. None of the contracting corporations paid any fee, bonus or commission for any phase of the transaction and no officer or director received any. The directors are shown by the evidence to be business men, active in commercial and financial circles, well to do in their own right, and at least beyond the necessity of disloyal and perfidious betrayals of their trusts.
The series of transactions involving sales or exchanges of stock in 1928 were made by authority of the board of directors upon the recommendation of Mr. R.B. Brown, the president. The first corporate action in connection with this transaction occurred at a meeting of the executive committee on July 3d 1928, when the president submitted a plan for an exchange of securities between the American, the United and the Koppers and recommended the plan for the approval of the committee. The executive committee approved the plan and recommended it to the board of dirctors for adoption. On the afternoon following the morning meeting of the executive committee, the board of directors by resolution approved the plan.
The original certificate of incorporation of American was filed April 6th, 1901, and the original by-laws adopted May 31st, 1901, at the first meeting of the incorporators and subscribers to the capital stock. Among the provisions in the by-laws then adopted appear the following: *Page 12 
"Article II, Section 9:
"Contracts. Inasmuch as the Directors of this Company are men of large and diversified business interests, and are likely to be connected with other corporations with which from time to time this Company may have business dealings, no contract or other transaction between this Company and any other corporation shall be affected by the fact that Directors of this Company are interested in, or are directors or officers of, such other corporation.
"The Board of Directors in its discretion may submit any contract or act for approval or ratification at any annual meeting of the stockholders, or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the capital stock of the Company which is represented in person or by proxy at such meeting (provided that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and binding upon the corporation and upon all the stockholders as though it had been approved or ratified by every stockholder of the corporation."
This by-law remained unchanged until April 6th, 1909, when it became section 8 of Article II, and the first paragraph was amended by insertion of the words "or may be," as follows:
"Contracts. Inasmuch as the Directors of this Company are ormay be men of large and diversified business interests, and are likely to be connected with other corporations with which from time to time this Company may have business dealings, no contract or other transaction between this Company and any other corporation shall be affected by the fact that Directors of this Company are interested in, or are Directors or officers of, such other corporation."
Such a by-law as was said in United States Steel Corp. v.Hodge, 64 N.J. Eq. 807, 811; 54 Atl. Rep. 1, cannot amplify the corporate powers to the extent of validating any act ultravires the corporation, but it enables the stockholders, by majority vote, to ratify any contract which the stockholders or the corporation might lawfully make.
The by-law, as amended in 1909, was in effect at the time of the transaction complained of.
American gave notice by mail and publication of an annual meeting of stockholders to be held March 18th, 1929, which notice stated that it was called "for the purpose of electing directors, and for the transaction of such other business as may be brought before the meeting, including considering and *Page 13 
voting upon the approval and ratification of all contracts, acts, proceedings, elections and appointments by the board of directors, executive committee or stockholders since the last annual meeting of the company."
There were present at that meeting of stockholders in person and by proxy the holders of six hundred and eighty-six thousand one hundred sixty-five shares out of a total of eight hundred and twenty-five thousand seven hundred and seventy-nine shares entitled to vote; four thousand and three shares were represented in person and the balance by proxy, the proxy committee holding and voting proxies for five hundred and ninety-three thousand and twelve shares. According to the by-laws one-third of all the shares of the capital stock of the company constituted a quorum. The annual report of the company for the year ending December 31st, 1928, was presented and ordered filed. The minutes of all meetings of the executive committee and of the board of directors since the last annual meeting, including the minutes of the executive committee and of the board of directors at which the 1928 transaction was concluded were read by the secretary and resulted in the passage of a resolution by the stockholders approving the minutes of the last annual meeting and "the minutes of all directors' meetings and the minutes of all executive committee meetings held subsequent to the annual meeting of stockholders of March 19th, 1928, be and they hereby are in all respects approved, confirmed and ratified as read; and resolved further that all acts, matters and proceedings entered into and performed by the officers, directors and executive committee since the last annual meeting of stockholders be and they hereby are in all respects ratified, confirmed and approved."
The vote which was taken by ballot upon the adoption of the resolution resulted in five hundred and ninety-six thousand and thirty shares for adoption and ninety thousand one hundred shares against, and the resolution was declared adopted.
Complainant Helfman who made his first purchase of stock in May, 1923, was not present at the meeting nor was his stock represented by proxy. *Page 14 
In view of American's charter empowering the company to operate essentially as a utility holding company, the by-law provisions are readily understandable. Such a corporation would likely seek for membership upon its board of directors, men of broad experience in the operation and management of utility companies, who, in the nature of things would likely be interested financially and perhaps officially with other utility companies.
The decisions in this state are not entirely clear as to the rule which is to be applied where two corporations having common directors contract with each other or where a corporation contracts with another corporation in which one or more of its directors has an interest. However, the incorporators of American, at the time of its organization, determined for themselves the status which a contract made between it and such other corporation should have and embodied this determination in a by-law of the corporation.
The by-law authorizes the directors of American to make valid and binding contracts with corporations having common directors with American and also with corporations in which American's directors may be interested or of which they may be directors or officers.
The power of stockholders to specifically authorize such contracts or to ratify them after they have been made, unless such contracts are ultra vires, fraudulent or oppressive, is not open to question. United States Steel Corp. v. Hodge
(Court of Errors and Appeals), supra; Mitchell v. United BoxBoard and Paper Co., 72 N.J. Eq. 580, 586; 66 Atl. Rep. 938;Stephany v. Marsden, 75 N.J. Eq. 90, 93; 71 Atl. Rep. 598;affirmed, 76 N.J. Eq. 611; 75 Atl. Rep. 899.
The 1928 transaction, therefore, was prima facie valid and could not be successfully attacked without proof that it was of such a character as that the stockholders could not authorize it in advance or ratify it, or that it was ultra vires, fraudulent or oppressive.
Further, complainants contend that Koppers and United jointly and acting in concert, controlled American and directly exercised control in carrying through the 1928 transaction, and counsel argue that when the owner of the majority of the *Page 15 
capital stock of a corporation uses the power possessed by him by reason of such ownership to secure the assets of the corporation for himself in fraud of the rights of the minority stockholders he becomes a trustee for the corporation. But this rule has no application to the case at bar for the reason that in the instant case the action taken was not ultra vires, and the proof fails to establish fraud or oppression. Moreover, it does not appear that Koppers or United, acting alone, possessed even semblance of control of American, for together these companies held but thirty-eight and fifty-nine hundredths per cent., the holdings of Koppers never exceeding eighteen and forty-one hundredths per cent., and those of United twenty and eighteen hundredths per cent. If it were found to be the fact that Koppers and United did act together, such control by itself alone would not support complainants' claim that either Koppers or United became trustees of American or its stockholders. "The majority stockholder is not made a trustee for the minority stockholders in any sense by the mere fact that he holds a majority of the stock, or by the further fact that he uses the voting power of his stock to elect a board of directors for the corporation. The majority stockholder does not necessarily control the directors whom he appoints, and, in fact, he has no right to control them, and if they are controlled by him, they may be violating their duty, for which he also may be liable. The majority stockholder may use his voting power so as to constitute all the holders of the minority stock the entire board of directors. No liability of the majority stockholder to the minority stockholder for the misdeeds of their common trustees — the directors — can arise from the mere fact that the majority stockholder had the power to appoint, or, in fact, did appoint, these trustees. Such liability, however, may arise if the majority stockholder has made the derelict trustees his agents and dictated their conduct, and thus caused a breachof fiduciary duty, of which the minority stockholders complain."Robotham v. Prudential Insurance Co., 64 N.J. Eq. 673, 689;53 Atl. Rep. 842. (Italics mine.) In the instant case there is no evidence that the action of any of the *Page 16 
directors was the result of dictation on the part of majority stockholders.
Under ordinary circumstances, a director who deals with his corporation has the burden of sustaining the fairness of the transaction when it is attacked by the corporation, because the director is a trustee for the corporation and his dealings with his cestui que trust are regarded with suspicion. A contract, therefore, made between a corporation and a director of such corporation is voidable at the option of the corporation. Such option, however, belongs to the corporation and is not exercisable by a minority stockholder unless the contract isultra vires, fraudulent or oppressive. See Mitchell v.United Box Board and Paper Co., supra; Endicott v. Marvel,81 N.J. Eq. 378, 382, 383; 87 Atl. Rep. 230; Lillard v. Oil, Paintand Drug Co., 70 N.J. Eq. 197 (at p. 205); 56 Atl. Rep. 254;United States Steel Corp. v. Hodge, supra; Colgate v. UnitedStates Leather Co., 73 N.J. Eq. 72; 67 Atl. Rep. 657; Bingham v.Savings Investment and Trust Co., 101 N.J. Eq. 413;138 Atl. Rep. 659; affirmed, 102 N.J. Eq. 302; 140 Atl. Rep. 321; GeneralInvestment Co. v. American Hide and Leather Co., 97 N.J. Eq. 230; 127 Atl. Rep. 659; Stephany v. Marsden, supra.
The rule that a contract between a director and his corporation is voidable at the option of the corporation has not, however, been applied to contracts between corporations having one or more common directors. Robotham v. Prudential Insurance Co., supra;Pierce v. Old Dominion, c., Smelting Co. et al., 67 N.J. Eq. 399; 58 Atl. Rep. 319; Hyams v. Old Dominion Copper Mining andSmelting Co., 82 N.J. Eq. 507; 89 Atl. Rep. 37; affirmed, 83 N.J. Eq. 705; 92 Atl. Rep. 588; Marcy v. Guanajuato Development Co.et al., 228 Fed. Rep. 150; General Investment Co. v. AmericanHide and Leather Co., supra.
When controlling stockholders actually assume control in the direction of the affairs of a corporation and intermeddle with the assets of the corporation and deal therewith to their own advantage, or in their own interest, it may well be that such directors thereby become affected by and subject to the rules which relate to persons standing in a fiduciary capacity. *Page 17 
The by-law provisions herein set forth, it should be said, do not operate to such an extent, however, as to foreclose the court from scrutinizing the 1928 transaction as to its fairness. When so scrutinized and considered as one entire transaction, or divided into its component parts, the conclusion is reached that the same was not only lawful and free of fraud or oppression but that it was fair to American, it having received full value for all that it conveyed to Koppers or United. And it should be noted in passing that this suit is brought by complainants for the benefit of all stockholders who might see fit to come in. None has seen fit so to do, and the natural inference is that none has any complaint to make. Kelly v. Black, 91 N.J. Eq. 520, 523;111 Atl. Rep. 22.
The proofs clearly demonstrate that there was no combination between United and Koppers to appropriate any of the assets of American for their own purposes and there was no combination between the directors who were respectively associated with United and Koppers to accomplish that purpose. In the evidence Mr. Brown and Mr. Brooks narrate in minute detail the inception of the transaction and the reasons for it. It is quite apparent from the record that United and its directors were concerned solely with the interests of American, and the interests of United as a stockholder of American were precisely the same as those of any other stockholder of American. It must be remembered that when the 1928 transaction was completed United had increased its investment in American stock. It is inconceivable therefore that United or the directors associated with it would have been parties to a scheme to strip American of its assets.
With respect to Mr. Brown it is improbable that he would have been a party to a fraud on American which would result in financial injury to the company of which he was to continue as president.
Similarly so with Koppers, for while it ceased to be a stockholder of American, yet nevertheless it increased its stock holdings in United, which in turn, as I have pointed out above, had increased its holdings in American. The statement of these facts alone disposes of the unproved charges of a conspiracy to wreck American. *Page 18 
All parties concerned in the 1928 transaction, it appears from the evidence, were actuated by a sincere desire to protect and benefit American without undue injury to either United or Koppers. And, while the ultimate result cannot be taken into consideration in judging the fairness of the transaction as of the date it took place, the final result may be considered in arriving at the wisdom or otherwise of the directors of American in connection with the 1928 transaction. The stark fact is that the transaction has operated to the great benefit and advantage of American.
There is no proof that as a result of the 1928 transaction American did not receive full value for that with which it parted. It is argued by complainants that notwithstanding this fact Koppers should account to American for what is said to be the profit made by Koppers on the transfer of the plant of Milwaukee Coke and Gas Company.
The theory on which this is predicated is somewhat nebulous. Stating the view as simply as possible it is that when Mr. Rust as president negotiated for the purchase of Milwaukee Coke and Gas Company by Koppers that Koppers, because it was a stockholder of American, took the plant charged with some sort of a trust for American. There are several answers which completely dispose of this contention. Koppers through Mr. Rust or any other agent designated for this purpose had the right to purchase Milwaukee Coke and Gas Company or any other property for its own legitimate corporate purposes and this purchase by Koppers, I find as a fact, was for its legitimate corporate business without regard to American. Furthermore, the record clearly shows as an indisputable fact that the Milwaukee plant had been offered to American and American had declined to purchase it. Those in charge of American's affairs entertained a firm belief that a gas company should not own its source of supply of gas.
In arriving at these conclusions on this phase of the case I have disregarded the fact that American in the Milwaukee Coke transaction acted through its wholly owned subsidiary Milwaukee Gas and Light.
When Koppers bought the Milwaukee Coke plant there was no thought on Koppers' part to sell it to American. As I *Page 19 
indicated Koppers bought the plant for its own legitimate corporate purposes. While Milwaukee Gas and Light Company received a large part of its gas from the Milwaukee Coke plant it could and actually did operate without owning the coke plant. The cases which indicate that a stockholder will not be permitted to go out and purchase in his own right that which is essential to the conduct of the business of his corporation are therefore inapplicable.
In concluding the so-called 1928 transaction it must be clearly borne in mind that there is not a scintilla of evidence that United had anything to do with the purchase of Koppers of the Milwaukee Coke plant.
In the second cause of action the complainants charge the directors of American with negligence in purchasing and thereafter holding shares of International. The purchase is also said to be ultra vires because the International was not wholly operated as a utility company but was partly engaged in the paper industry.
The second amended certificate of incorporation filed by American on May 13th, 1901, grants to the defendant powers sufficiently broad, it is held, to purchase the stock of the International even though that company engaged partly in the paper industry. Moreover, the evidence shows that the property and the business of the International was preponderantly that of a public utility. The American was organized for the purposes of carrying on any lawful business capable of being conveniently carried on in connection with the operation and ownership of utilities. The seventh article grants to the board of directors power to purchase any property of any nature in their judgmentuseful or convenient in the business of the corporation, and further specifically provides that the corporation shall have power to purchase the capital stock of any other corporation or corporations and to exercise while owner of the same all of the rights which a natural person might exercise as their owner. The doctrine of ultra vires is to be reasonably and not unreasonably, understood and applied, and whatever may be fairly regarded as incidental to, and consequential upon, those things which are authorized by the charter *Page 20 
of the company, ought not (unless expressly prohibited) to be held by judicial construction to be ultra vires. Ellerman v.Chicago Junction Railways, c., Co., 49 N.J. Eq. 217, 242;23 Atl. Rep. 287.
The negligence asserted on the part of the directors without here reviewing the evidence upon which the assertion is predicated, seems to be, that the directors imprudently purchased the stock and imprudently failed to sell it before the depression in the market in 1929. In the argument the subject is treated as if the directors were acting as fiduciaries of a trust estate. Not so. Here, the capital of the corporation was to be employed in business pursuits and the apparent purpose of the corporation was to invest its capital in stocks and properties with a view to accretion in value and a reasonable return on the investment. If the judgment of the board of directors was honestly and prudently exercised in purchasing and holding the stock the court may not substitute its judgment for that of the board of directors.
The evidence does not disclose that in the purchase of International the directors failed to exercise such care and caution as would ordinarily be exercised by a person acting for himself. Judged as of the date the purchase was made the evidence is that they acted with extraordinary care, and were, therefore, justified in believing that the investment was a good one and in the best interests of the company.
It is gathered from the evidence that the board of directors at the time they purchased stock knew of its disabilities, the company at that time being engaged in a development which gave promise of future return. The stock was not purchased as a speculation but as a permanent investment after an analysis of the plan and the properties of the company. The stock increased in market value and remained stable until the depression. The drop in market value of stocks did not affect International only, it affected all stocks. If the board of directors should even be held to the accountability of trustees, it is settled law that in the absence of proof of bad faith or the failure to exercise reasonable discretion, they could not be held liable in not selling. The defendants-directors acted *Page 21 
no differently than did many thousands of other ordinarily prudent and cautious persons who were trustees of estates and actually fiduciaries but whose action was subsequently approved by our courts. A trustee who, within the scope of his powers, acts in good faith, and prudently discharges the obligation of his trust is not responsible for errors of judgment. Harris v.Guarantee Trust Co., 115 N.J. Eq. 602; 172 Atl. Rep. 209; In reCross 117 N.J. Eq. 429; 176 Atl. Rep. 101.
If the action of the directors in the purchase and failure thereafter to sell the stock of the International were even to be judged by the rules just cited, there is nothing in the evidence upon which the charge of negligence could be rested. In a purely business corporation such as that of American the authority of the directors in the conduct of the business of the corporation must be regarded as absolute when they act within the law, and the court is without authority to substitute its judgment for that of the directors. Whether the business of such a corporation should be operated at a loss during a business depression or close down at a smaller loss, is in the absence of a showing of bad faith or abuse of power a purely business and economic problem to be determined by the directors of the corporation and not by the court. Ellerman v. Chicago Junction Railways, c.,Co., supra; Farmers Loan and Trust Co. v. Hewitt, 94 N.J. Eq. 65; 118 Atl. Rep. 267; Kelly v. Kelly-Springfield Tire Co.,106 N.J. Eq. 545; 152 Atl. Rep. 166.
It is deemed important and therefore here noted that on October 25th, 1929, complainant Helfman discussed the 1928 transaction and the purchase of International Paper with Mr. Brown; that Helfman sent for and received a report on International Paper and on October 28th, 1929, bought two hundred shares of American stock at $275 per share (the par of which was $100), and on October 25th, 1929, he bought one hundred shares at $275 per share. These shares of stock were purchased after Helfman talked with Mr. Brown. So that Mr. Helfman evidently thought so well of the transaction that he speculated in American on his own account. The stocks rose in value but complainant Helfman did not sell. *Page 22 
The third cause of action is founded upon the purchase in August, 1930, of one hundred and twenty-six thousand shares of Detroit Edison, at $222.50 per share. American began the purchase of Detroit Edison stock in May, 1926, and prior to 1928 had already acquired six thousand four hundred and fifty-six shares at a cost of $849,231.75. The additional purchases before and after the purchase of the seventy-five thousand shares of Detroit Edison involved in the 1928 transaction brought the total at the time of the purchase in 1930 up to one hundred thirty thousand eight hundred and forty-one shares. The purchase in 1930 complained of was made from Otis Company.
Respecting this transaction the evidence shows that at a meeting of the executive committee of the board of directors of American held on August 15th, 1930, the chairman reported that the company's subsidiaries, Dexter Company and Eastern Company, owned about one hundred and thirty thousand shares of Detroit Edison stock and that Otis Company held one hundred and twenty-six thousand shares, which they desired to sell. The chairman stated he believed that the purchase of this one hundred and twenty-six thousand shares would substantially strengthen the company's position and increase the value of the block of stock presently owned. It would make the company (and its subsidiaries) the largest single stockholder in the Detroit Edison Company. The North American Company and its associates, he reported, owned a large block of Detroit Edison stock, and their holdings being probably somewhat larger than that of American and its subsidiaries would own if the purchase be made, and the combined holdings of the North American Company and American (and its subsidiaries) would approximate forty-five per cent. of the total stock of the Detroit Edison Company.
The following resolution was then adopted:
"Resolved: That the officers of the Company be authorized and empowered to negotiate with Otis Co. for the purchase of 126,000 shares of Detroit Edison stock at not to exceed $222.50 per share, and if such negotiations are successful to contract with Otis Co. for the purchase of said stock on such terms and conditions as the officers may deem advisable." *Page 23 
Subsequently, at a meeting of the board of directors on September 26th, 1930, the minutes of the executive committee meeting of August 15th were read and approved.
The stockholders met on March 23d 1931, after notice to all the stockholders, including Helfman, and he attended this meeting. The minutes of the executive committee meeting of August 15th, 1930, and the directors' meeting of September 26th, 1930, were read, and the following resolutions adopted:
"Resolved that this meeting of the stockholders recommends that the minutes of the Executive Committee meeting of September 10, 1930, be amplified to include a report by the President showing that the 126,000 shares of Detroit Edison were purchased at $222.50 per share, and received by this Company as authorized by the Committee at its meeting of August 15, 1930, and as shown by the Treasurer's report appended to the minutes of said meeting of September 10, 1930.
"Resolved that the minutes of all Directors' meetings and Executive Committee meetings held subsequent to the annual stockholders' meeting of March 17, 1930, and all the acts, matters and proceedings entered into by the officers, directors and Executive Committee, pursuant to such minutes (amplified as recommended at this meeting) be, and the same hereby are ratified, approved and confirmed."
There were three million three hundred and three thousand six hundred and twenty-three shares entitled to vote, of which two million seven hundred and eighty-four thousand two hundred and eighty shares were present in person or by proxy (more than a quorum under section 3 of the by-laws). The resolutions of approval were adopted by the vote of two million four hundred and twenty-four thousand four hundred and sixty-eight shares. Against three hundred and fifty-nine thousand eight hundred and twelve shares were voted including five thousand seven hundred shares held by Mr. Helfman. Between the annual meetings of 1929 and 1930 the American shares had been split, four for one, which accounts for the increased shares at the 1930 meeting.
Cyrus S. Eaton was at the time and had been for many years a partner of Otis Company, members of the New York Stock Exchange, and also a director and member of the executive committee of American. Prior to the meeting of August 15th, 1930, he tendered his resignation as to both positions, which was accepted at that meeting. *Page 24 
The Detroit Edison stock purchased was actually owned by Foreign Utilities, Limited, with the exception of a small amount held by Industrial Shares, Incorporated. Foreign Utilities, Limited, was a Canadian corporation holding no stock in American, and American held none in it. Eaton was not a director or officer of Foreign Utilities, Limited, and there is not involved the question of common directorate. Eaton and his wife owned approximately twenty-six per cent. of the stock in Foreign Utilities and some of Eaton's relatives held substantial stock interest in the company.
The attack by complainants with respect to this transaction is leveled at the price paid of $222.50 per share, when the book value of Detroit Edison was about $112, the earnings in 1929 per share $11.15, in 1930, about $8.75, the dividend rate eight per cent., and the return to American in 1930, less than four per cent. It is argued that the purchase was made to help Eaton, who complainants' counsel say dominated and influenced the board of directors who "gulped down * * * the principal stockholder's offer without ascertaining the true ownership of the stock or the profits accruing to him" and "paid an excessive, unwarranted price for the stock," which would not have been paid had their judgment been free and independent. Worthy of much attention and bearing upon this argument is the admission of complainants' counsel in their brief that "the determination of the price which they would have been justified in paying is, of course, difficult. Under all the circumstances, and on the evidence, we submit that $160 per share would have been a fair price, and $175 a share, the maximum within limits of reason and good judgment."
The evidence and exhibits in this case embrace twenty-five volumes. Until now no attempt to discuss the evidence in detail bearing upon any point has been made, and reasonable brevity demands that that course be continued. It is sufficient to say that the evidence does not sustain the charge made by the complainants that the directors were negligent in consummating this transaction, and this aside from the ratification by the stockholders. *Page 25 
The bill of complaint, paragraph 4 of the third cause of action, alleges that (1) there was no sound business or economic reason for the purchase of the Detroit Edison stock; (2) the purchase was made to enable Otis Company and C.S. Eaton to dispose of the stock at a price greatly in excess of its true value and thus to assist them in the financial difficulties in which, it is alleged, they were then involved, and which subsequently resulted in their retirement from business; (3) the price paid was fraudulently excessive, the stock not being worth in excess of $175 per share; (4) the stock was purchased on a declining market and the earnings had been declining for some time previous.
Considering these allegations and the evidence produced the conclusion is arrived at that as to the first, American had funds to invest and was carrying them in the debentures only until it could find a suitable investment. The evidence does not show that the purchase was not made in pursuance of a sound business policy.
As to the second, there is no evidence that either Otis 
Company or Cyrus S. Eaton were at the time in any financial difficulty. Each defendant was asked in interrogatories concerning his knowledge of the financial condition of Otis 
Company and Mr. Eaton in August, 1930, and none knew of any financial difficulty.
And now as to the third claim of complainants that the stock was not worth in excess of $175 per share, that is purely the complainants' judgment and there is no evidence that the price paid was fraudulently excessive. It had gone to $385 in August, 1929. Even after the market break it rebounded to $255.75 in April, 1930. The evidence, when considered together with the reasons advanced for the purchase, indicates honest business judgment. The stock, to say the least, was of greater value to American under the circumstances than to any one else.
With respect to the fourth allegation, it is common knowledge that in August, 1930, there existed no obvious condition in either stock market or business world, which would indicate further serious recession in market values or in business activity. These ordinarily prudent business men did not *Page 26 
believe that there was to be a break in the continuity of profitable utility investment and operation or conclude that they should allow the large block of Detroit Edison shares offered them, get away possibly for all time. It is now a matter of common knowledge that more fortunes were lost on account of their owners having entered the market after the breaks than before. Conservative business men entered feeling that the bottom had been reached. Our court of errors and appeals chartered our course in connection with this phase of the case. In reversing the late Vice-Chancellor Backes, they said in In re Cross,supra: "His," executors, "judgment erred. So did many another's without any taint of gambling or speculation. There was no proof that the stocks were trash, or that the prospect for their recovery was not on a par with the expectations for the general securities market, or that there was any popular belief that security prices in 1931 would continue their recession.
"The treacherous path that lay before the investor, whether trustee or otherwise, in the spring and summer of 1931 (when it is suggested that the executors should have sold and reinvested), is apparent when, with the advantage of retrospection, we look upon the debacle that ensued. Favored forms of trust investment were sucked into the maelstrom — mortgage investments, corporate bonds, and even cash in bank. * * * However loudly it may now be said that people should have foreseen, most men of that degree of prudence and caution that we call ordinary did not foresee. Wisdom after the event is not the test of responsibility." The decree surcharging the executors in the cited case for failure to sell securities which at the peak preceding the 1929 crash possessed the value of $71,000, and which had declined to $9,000 at the time the suit was brought, was reversed.
The foregoing disposes of the further claim on the part of the complainants predicated upon the depreciation in security value of the Detroit Edison stock, for certain it is that if the events which transpired between 1929 and the filing of this bill of complaint militate to save harmless a trustee for negligence alleged against him for failure to dispose of securities and consequent depreciation in value, these defendants-directors *Page 27 
of a business corporation may not be held liable for negligence or mistake of judgment in that regard if that judgment was honestly exercised and fairly within the scope of the power confided to them.
The bill of complaint will be dismissed. Present decree.